MARY E. ALEXANDER, ESQ. (SBN: 104173)
Email:  malexander@maryalexanderlaw.com
Mary Alexander & Associates, P.C.
44 Montgomery Street, Suite 1303
San Francisco, California 94104
Telephone:  (415) 433-4440
Facsimile:  (415) 433-5440

ELIZABETH J. CABRASER (SBN: 083151)
Email:  ecabraser@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

GRETCHEN NELSON (SBN: 112566)
Email:  gnelson@nflawfirm.com
Nelson & Fraenkel LLP
601 So. Figueroa Street, Suite 2050
Los Angeles, CA 90017
Telephone:  (213) 622-6469
Facsimile:  (213) 622-6019

*Attorneys for Plaintiffs*
[Additional counsel on signature page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CYNTHIA LYNN FORD; JAMES DAVID ARTHUR FORD; CAROLE KEALY; KELLY SANDOVAL; RUBEN SANDOVAL; STEPHEN COLLINS; SARAH DAVIES; KURT EMERALD; TRACY EMERALD; LARRY A. FISHER; RITA FISHER; DAVID GONSALVES; MARY ANN GONSALVES; TRACIE LING; BRIAN LOSIE; PEGGY LOSIE; JOHN MILLER; RENATE MILLER; KENNETH PRAG; MARIE RIVERA; PAUL RIVERA; JOHN SHATERIAN; and JUDITH SHATERIAN, on behalf of themselves and all others similarly situated, <br><br>Plaintiffs, <br><br>vs. <br><br>CARNIVAL CORPORATION; CARNIVAL PLC and PRINCESS CRUISE LINES LTD., <br><br>Defendants. | Case No.:  2:20-cv-06226-DDP (AFMx) <br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES** <br><br>1.  NEGLIGENCE <br>2.  GROSS NEGLIGENCE <br>3.  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS <br><br>**DEMAND FOR JURY TRIAL** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COMPLAINT AND JURY DEMAND

Individual and representative Plaintiffs CYNTHIA LYNN FORD; JAMES DAVID ARTHUR FORD; CAROLE KEALY; KELLY SANDOVAL; and RUBEN SANDOVAL bring this action for themselves and on behalf of all persons similarly situated, including Individual Plaintiffs STEPHEN COLLINS; SARAH DAVIES; KURT EMERALD; TRACY EMERALD; LARRY A. FISHER; RITA FISHER; DAVID GONSALVES; MARY ANN GONSALVES; TRACIE LING; BRIAN LOSIE; PEGGY LOSIE; JOHN MILLER; RENATE MILLER; KENNETH PRAG; MARIE RIVERA; PAUL RIVERA; JOHN SHATERIAN; and JUDITH SHATERIAN, and the more than 2000 other passengers who sailed on the roundtrip Motor Vessel ("M/V") GRAND PRINCESS cruise from San Francisco, California on February 11, 2020, to Mexico, against Defendants, PRINCESS CRUISE LINES LTD. ("PRINCESS"), its parent companies CARNIVAL CORPORATION & CARNIVAL PLC (collectively, "CARNIVAL") and allege:

## THE PARTIES

1.     Individual and representative Plaintiff Cynthia Lynn Ford is *sui juris*, a resident of Placer County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

2.     Individual and representative Plaintiff James David Arthur Ford is *sui juris*, a resident of Placer County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

3.     Individual and representative Plaintiff Carole Kealy is *sui juris*, a resident of San Francisco County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

4.     Individual and representative Plaintiff Kelly Sandoval is *sui juris*, a resident of Shasta County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

5.     Individual and representative Plaintiff Ruben Sandoval is *sui juris*, a resident of Shasta County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

6.     Individual Plaintiff Stephen Collins is *sui juris*, a resident of San Francisco County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, and continued onboard the ship to Hawaii.  He disembarked on or about March 10, 2020.

7.     Individual Plaintiff Sarah Davies is *sui juris*, a resident of Solano County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

8.     Individual Plaintiff Kurt Emerald is *sui juris*, a resident of Shasta County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

9.     Individual Plaintiff Tracy Emerald is *sui juris*, a resident of Shasta County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

10.    Individual Plaintiff Larry A. Fisher is *sui juris*, a resident of Alameda County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

11.    Individual Plaintiff Rita Fisher is *sui juris*, a resident of Alameda County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

12.     Individual Plaintiff David Gonsalves is *sui juris*, a resident of Contra Costa County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

13.     Individual Plaintiff Mary Ann Gonsalves is *sui juris*, a resident of Contra Costa County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

14.     Individual Plaintiff Tracie Ling is *sui juris*, a resident of Solano County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

15.     Individual Plaintiff Brian Losie is *sui juris*, a resident of British Columbia, Canada, and was a passenger onboard the Grand Princess cruise from February 11, 2020, and continued onboard the ship to Hawaii.  He disembarked on March 9, 2020.

16.     Individual Plaintiff Peggy Losie is *sui juris*, a resident of British Columbia, Canada, and was a passenger onboard the Grand Princess cruise from February 11, 2020, and continued onboard the ship to Hawaii.  She disembarked on March 9, 2020.

17.     Individual Plaintiff John Miller is *sui juris*, a resident of Sonoma County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

18.     Individual Plaintiff Renate Miller is *sui juris*, a resident of Sonoma County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

19.     Individual Plaintiff Kenneth Prag is *sui juris*, a resident of San Francisco County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, and continued onboard the ship to Hawaii.  He disembarked on March 10, 2020.

20.    Individual Plaintiff Marie Rivera is *sui juris*, a resident of Contra Costa County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

21.    Individual Plaintiff Paul Rivera is *sui juris*, a resident of Contra Costa County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

22.    Individual Plaintiff John Shaterian is *sui juris*, a resident of Contra Costa County, California and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

23.    Individual Plaintiff Judith Shaterian is *sui juris*, a resident of Contra Costa County, California, and was a passenger onboard the Grand Princess cruise from February 11, 2020, to disembarkation on February 21, 2020.

24.    Defendant CARNIVAL CORPORATION was incorporated in 1972 in Panama and has its headquarters in Miami, Florida.

25.    Defendant CARNIVAL PLC was incorporated in 2000, in Wales, United Kingdom. It also has its headquarters in Miami, Florida.

26.    Upon information and belief, Defendant PRINCESS CRUISE LINES LTD. is incorporated in Bermuda, with its headquarters in Santa Clarita, California.

27.    Upon information and belief, at all times hereto, CARNIVAL CORPORATION, CARNIVAL PLC, and PRINCESS advertised, marketed, sold, and profited (directly or indirectly) from and owned, controlled, and operated the cruise ship, M/V GRAND PRINCESS.

## **ALTER EGO/PIERCING CORPORATE VEIL**

28.    Defendants CARNIVAL CORPORATION, CARNIVAL PLC, AND PRINCESS are alter egos and/or agents of each other such that the corporate form should be disregarded.

SECOND AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES

29.     CARNIVAL CORPORATION and CARNIVAL PLC operate as a single economic enterprise. They share a senior executive management team and identical Boards of Directors. Both CARNIVAL CORPORATION and CARNIVAL PLC share a single headquarters in Miami, Florida. They are one and the same.

30.     As described by CARNIVAL CORPORATION in a filing with the Securities and Exchange Commission ("SEC"), "Carnival Corporation and Carnival plc operate a dual listed company ('DLC'), whereby the businesses of Carnival Corporation and Carnival plc are combined through a number of contracts and through provisions in Carnival Corporation's Articles of Incorporation and By-Laws and Carnival plc's Articles of Association."

31.     Plaintiffs bring this lawsuit against CARNIVAL CORPORATION and CARNIVAL PLC individually, but because the entities work as alter-egos and/or agents of one another, Plaintiff refers to them collectively throughout this Complaint as "CARNIVAL."

32.     In the same SEC filings in which CARNIVAL explains the DLC, it also claims a portfolio of cruise brands which it breaks into two segments:  (1) the North America Segment, which includes PRINCESS, and (2) the Europe Australia and Asia Segment.  CARNIVAL represents that, with these two segments, it "operate[s] over 100 cruise ships within a portfolio of leading global, regional, and national cruise brands." CARNIVAL further provides details as to the passenger capacity of each of its subsidiary brands, and each brand's respective percentage of the total capacity of CARNIVAL CORPORATION.

33.     CARNIVAL, through its interlocking directorate and officers, exercises total domination over its subsidiaries, including PRINCESS, to the extent that PRINCESS and other subsidiaries manifest no separate corporate interests of their own and function solely to achieve the purposes of CARNIVAL. CARNIVAL

SECOND AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES

exercises total control over the finances, purchases, cruise brands, sale and assignment of vessels, assumption of debt, marketing, strategy, policy, reporting, and stock option awards for overlapping officers. For example:

a. CARNIVAL and PRINCESS share the same Board of Directors and almost all of the same executive officers, including Dr. Grant Tarling, who serves as CARNIVAL's Senior Vice President and Chief Medical Officer as well as the Chief Medical Officer for each of CARNIVAL's cruise line brands, including PRINCESS;

b. On its own website (www.carnivalcorp.com) and in legal proceedings and other public records, CARNIVAL admits and stipulates that its cruise brand lines are "not stand-alone corporate entities …", they are "divisions" "group(s)," "business units," or "interoperations" all conducting business as "a single unified economic entity";

c. Business or daily operations such as marketing and cruise bookings (including agents' bookings), are conducted under brand names or "divisions" not by subsidiaries.  The brand names are owned by CARNIVAL and are controlled by CARNIVAL through its interlocking Board of Directors and its officers;

d. CARNIVAL evaluates the performance of each of its "divisions," including PRINCESS, according to specific criteria and goals, including "ticket revenue, on board revenue, cruise costs, fuel consumption, cash flows, budget, introduction of new ships, debt leverage, strategic objectives, etc." CARNIVAL controls the resource allocation decisions for each subsidiary, including PRINCESS, based on those evaluations;

e. In past SEC filings, CARNIVAL has claimed the GRAND PRINCESS as one of its assets. CARNIVAL represents that the GRAND PRINCESS is one of its vessels for the purposes of aggregating CARNIVAL's own

SECOND AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES

worth, financial condition and abilities to the public and in business dealings, allowing it to leverage this value for its own benefit;

       f.     CARNIVAL controls the compensation paid to executives of its cruise line brands, including PRINCESS, through its Management Incentive Plan. Bonuses paid to executives of CARNIVAL's cruise line brands are determined both by whether the executive's cruise line brand met its "Brand Operating Income Target" and by whether CARNIVAL met its company-wide "Corporation Operating Income Target."

       g.     CARNIVAL also controls the compensation of the directors, officers, and employees of its subsidiaries, including PRINCESS, through a "stock plan to provide a means through which the *members of the Combined Group and their Affiliates* may attract and retain key personnel . . . and to provide a means whereby directors, officers, employees, consultants and advisors can acquire and maintain an interest in the Shares, or be paid incentive compensation …."

       h.     CARNIVAL commingles shared assets and negotiates berthing agreements and other port access agreements with port destinations and private islands on behalf of its "divisions," including PRINCESS;

       i.     CARNIVAL commingles assets and cash flows and makes loans to or investments in its "divisions";

       j.     CARNIVAL controls the purchase and manufacturing orders of new cruise vessels and the disposition of old cruise ships on behalf of its "divisions," including but not limited to the September 2020 sale of two PRINCESS cruise ships, the Sun Princess and the Sea Princess;[1]

---

[1] Princess Press Release, Sun Princess and Sea Princess to Leave Princess Cruises Fleet, (Sept. 21, 2020), https://www.princess.com/news/notices_and_advisories/notices/sun-and-sea-princess-to-leave-princess-cruises-fleet.html (last visited August. 17, 2021).

k.     CARNIVAL also claims for itself all of PRINCESS's purported rights, exemptions from liability, defenses, and immunities included in PRINCESS's Passage Contract, despite not being a signatory to the Passage Contract.

l.     In 2018, CARNIVAL implemented a HESS event reporting platform to "standardize HESS event reporting and analysis capabilities across our entire fleet."[2]

34.     In 2016, PRINCESS agreed to plead guilty to federal felony charges stemming from its illegal dumping of oil-contaminated bilge waste into the seas and intentional acts to cover it up. In its plea agreement, PRINCESS agreed to pay a $40 million penalty—the largest criminal penalty ever involving deliberate vessel pollution. Though CARNIVAL was not a defendant in the action, CARNIVAL signed the plea agreement and bound itself to its terms.

35.     The plea agreement noted that CARNIVAL "currently monitors and supervises environmental, safety, security, and regulatory requirements for Princess and other Carnival brands." Prior to the government investigation that led to the plea agreement, CARNIVAL had "undertaken steps to strengthen and enhance its oversight and compliance structure." For example, "the company initiated structural changes within its management organization, primary among which was the creation of a position titled 'Chief Maritime Officer,' placing the responsibility for overall environmental, safety, and security compliance in one individual …."

36.     The plea agreement required CARNIVAL to fund and implement an Environmental Compliance Plan ("ECP") across all of its brands, not just PRINCESS. The ECP required CARNIVAL to designate a Corporate Compliance Manager ("CCM") who was to "have overall responsibility for the implementation

---

[2] Sustainability from Ship to Shore, Carnival Corp. & PLC FY2018 Sustainability Report, https://safety4sea.com/wp-content/uploads/2019/06/Carnival-Corp.-Sustainability-From-Ship-to-Shore-2019_06.pdf (last visited August 17, 2021).

of[the] ECP" and "authorized to access all records, documents, facilities, and vessels, including all spaces within vessels necessary to perform their function, throughout CARNIVAL for the purpose of implementing [the] ECP."

37.    In 2019, the U.S. sought to revoke PRINCESS's probation for violating the terms of the ECP. The court in that case required members of the Executive Committee of the CARNIVAL Board of Directors (including the CEO and Chairman) be present at the revocation hearing.

38.    PRINCESS and CARNIVAL admitted to violating probation by failing to fully implement the ECP. In the settlement agreement for those violations, CARNIVAL agreed to issue a statement to all employees across all of its brands stating that CARNIVAL's CEO "personally accepts management responsibility for the probation violations …." As part of the settlement, CARNIVAL agreed to submit "an action plan for restructuring its corporate compliance functions, which includes creating a new Ethics and Compliance Department at All Brands Group that is part of a broader Ethics and Compliance Program that extends throughout the brands/operating lines; …."  The settlement agreement was signed "on behalf of Defendant" by three members of the "Executive Committees of the Boards of Directors of Carnival Corporation and Carnival plc," but no representatives of PRINCESS.

39.    Also in 2019, CARNIVAL announced that it was creating a new Chief Ethics and Compliance Officer "to further develop our ethics and compliance program across the entire corporation." CARNIVAL explained that "[i]t is important to note that the Ethics & Compliance is not just a single department within All Brands Group – but rather a corporate-wide program – with key Ethics & Compliance Officers . . . who help shape and implement the program initiatives in each of the operating companies."

40.     CARNIVAL, through its interlocking directorate and officers, established the safety policies for PRINCESS that led to the COVID-19 outbreak aboard the subject cruise.

a.     CARNIVAL promulgated HESS policies for all of its cruise line brands, including PRINCESS. CARNIVAL's HESS Corporate Policy, which is available to the public on CARNIVAL's website, states that CARNIVAL will "ensure compliance with this [HESS] policy within each of Carnival's Corporate and Operating Line organizations."[3]

b.     According to Dr. Grant Tarling, CARNIVAL's Senior Vice President and Chief Medical Officer, during the subject cruise, CARNIVAL sent safety operational directives and instructional notices regarding COVID-19 to each of its cruise brands, including PRINCESS. While some of these operational directives and instructional notices were specific to individual cruise brands or specific ships, CARNIVAL dictated and controlled the safety policies for each cruise brands, including PRINCESS;

c.     CARNIVAL distributed frequent "situation reports" on COVID-19 to each of its brands, including PRINCESS, providing the brands with medical information regarding COVID-19 as well as information about the financial impact of COVID-19 on CARNIVAL;

d.     According to Dr. Grant Tarling, CARNIVAL dictated and controlled the data regarding onboard illnesses that each cruise brand, including PRINCESS, were required to report to CARNIVAL, including data regarding actual or potential COVID-19 outbreaks onboard CARNIVAL ships;

e.     CARNIVAL controlled media communications regarding COVID-19 for all of its cruise brands, including PRINCESS. CARNIVAL dictated the specific language that its cruise brands were directed to use when

_____

[3] *Id.*

communicating with the media and passengers about COVID-19, including providing PRINCESS with "targeted points" to reassure passengers and the public that cruising on CARNIVAL's cruise ship brands was safe;

         f.      Indeed, Dr. Tarling himself provided multiple messages to the public on behalf of PRINCESS through YouTube and Facebook, regarding the status of the DIAMOND PRINCESS and about safety measures PRINCESS claimed to implement on PRINCESS ships;

         g.      CARNIVAL, through its governmental affairs officer Tandy Bondi, among others, also controlled communications with governmental agencies on behalf of its cruise line brands, including PRINCESS.

41.    In March 2020, CARNIVAL announced that it was implementing a temporary pause of cruise operations across all of its brands, including PRINCESS, as a result of the COVID-19 pandemic. To address the costs of this temporary pause to its operations, the CEO of CARNIVAL wrote a message to all of the employees of CARNIVAL and its subsidiary brands, stating: "I've directed our brand leaders to reduce or eliminate non-critical cash expenditures, but of course never cutting anything that would impact compliant, environmentally sound and safe operations."

42.    During this temporary pause, CARNIVAL was the lead borrower of $23 billion, which it used to finance its divisions' operating costs, including payoff of debt, salaries, purchases of assets & equipment, and the return of customers' deposits on cruise bookings.

43.    As demonstrated above, CARNIVAL has ownership and control over PRINCESS, and CARNIVAL exerts control and domination over PRINCESS's business and day-to-day operations. Plaintiff believes that further discovery will reveal the full extent of this control.

44.    Given CARNIVAL's control of operations and co-mingling of assets with PRINCESS—both of which can be more fully established through

discovery—the corporate form should be disregarded here. Failure to do so would thwart the interests of justice by allowing CARNIVAL to, on one hand, claim the GRAND PRINCESS as a part of its holdings, but then, on the other hand, disclaim responsibility for that vessel and the passengers traveling on it.

**JURISDICTION**

45.   This Court has Admiralty subject matter jurisdiction pursuant to 28 U.S.C. § 1333, as this case involves a maritime tort. The type of incident and injuries suffered by Plaintiffs and the Class had the potential to impact maritime commerce as Plaintiffs and the Class suffered harm and Plaintiffs and the Class were and continue to be at serious risk of imminent harm as a result of exposure to COVID-19 aboard the cruise ship upon which they were paying passengers.

46.   This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, codified at 28 USC § 1332(d)(2)(A) and (C), because the claims of the proposed Class Members exceed $5,000,000 and because at least one member of the Proposed Class of plaintiffs is a citizen of a state different from at least one Defendant. Further, this court has jurisdiction over the claims of certain individual Plaintiffs under 28 U.S.C. § 1332 because the amount in controversy exceeds seventy-five thousand dollars ($75,000), as to each of the individual Plaintiffs and Plaintiffs are citizens of a different state than the Defendants.

47.   This Court has personal jurisdiction over Defendants, who each conduct substantial business in this district.

48.   Defendant PRINCESS has its headquarters in Santa Clarita, California.

49.   Upon information and belief, CARNIVAL, including by and through its subsidiary, PRINCESS, markets cruise vacations to California residents and employs thousands of California residents to work at its California headquarters. The Court has personal jurisdiction over CARNIVAL because CARNIVAL is

authorized to do business in California, conducts substantial business in California, and some of the actions giving rise to this Complaint took place in California.

50.     The claims asserted herein arise from Defendants' contacts with California.

51.     Additionally, the Passage Contract purports to name the Central District as a proper venue to actions against the Defendants. Although Plaintiffs do not concede the enforceability of the Passage Contract, by naming this District as a proper venue, Defendants have consented to personal jurisdiction in this District.

52.     Each of the facts pleaded herein independently, but also all of these facts together, are sufficient to render the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

<u>**VENUE**</u>

53.     Venue in the Central District of California is proper under 28 U.S.C. § 1391 because Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction.

54.     Additionally, without conceding the enforceability of the Passage Contract, Plaintiffs acknowledge the inclusion in the Passage Contract of a venue selection provision designating the United States District Court for the Central District of California in Los Angeles as a proper venue for this action.

<u>**FACTUAL ALLEGATIONS**</u>

**I.     <u>COVID-19, Its Symptoms, and Long-Term Effects</u>**

55.     In December 2019, a new strain of Coronavirus known as COVID-19 or SARS-CoV-2 was first reported as having been diagnosed in humans in China.

56.     Studies show that the virus spreads when an infected person breathes out droplets and very small particles that contain the virus. These droplets and particles can be breathed in by other people or land on their eyes, noses, or mouth, or they may contaminate surfaces other people touch. People who are closer than 6

feet from the infected person are most likely to get infected.[4] Studies have indicated that spaces without poor or limited ventilation can cause greater accumulation of the airborne virus because of the presence of aerosolized droplets that can cause transmission.[5]

57.    The length of time that the virus can survive on surfaces remains unclear, but at least one study indicates that items with repeated and/or prolonged contact—such as a phone or television remote control—can carry the virus. The same study also showed the virus present on surfaces, such as floors and window sills, that were untouched by any patient, but which were in the stream of air flow in the patient's room.[6] Another study suggests that transmission is possible through shared elevator buttons.[7]

58.    The virus has an incubation period believed to be approximately 14 days,[8] but many of the ailments associated with COVID-19 persist for weeks and, in some instances, months.[9]

---

[4] Centers for Disease Control, *How COVID-19 Spreads* (Updated July 14, 2021), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited August 17, 2021).

[5] Apoorva Mandavilli, *A Smoking Gun': Infection Coronavirus Retrieved From Hospital Air* (August 11, 2020), https://www.nytimes.com/2020/08/11/health/coronavirus-aerosols-indoors.html (last visited August 20, 2021).

[6] Joshua L. Santarpia, et al., *Aerosol and surface contamination of SARS-CoV-2 observed in quarantine and isolation care,* Nature Research Scientific Reports (2020) 10:127732, https://www.nature.com/articles/s41598-020-69286-3 (last visted August 20, 2021).

[7] Aylin Woodward, *As asymptomatic coronavirus carrier infected an apartment neighbor without sharing the same space. A study blames the building's elevator buttons.*, Business Insider (July 5, 2020), https://www.businessinsider.com/coronavirus-jumped-between-people-via-elevator-surfaces-study-2020-7 (last visited August 20, 2021).

[8] Centers for Disease Control, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, Updated June 30, 2020, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

[9] Mark W. Tenforde, et al., *Symptom Duration and Risk Factors for Delayed Return*

59.     COVID-19 is sometimes associated with symptoms such as:  fever, cough, shortness of breath, body and muscle aches, and loss of taste and smell. The virus manifests differently, however, in different patients, striking some with brutal swiftness and others with more mild symptoms. Some people who contract the virus have a fever; others do not. Some suffer from extreme fatigue; others do not. Some report having a sore throat; others do not.[10] Some COVID patients never display any of these "typical" symptoms and instead experience COVID-19 as more of a stomach virus, experiencing diarrhea and/or vomiting. Others never experience gastro-intestinal distress. Still, some people test positive for the virus while appearing to be entirely asymptomatic, with no symptoms whatsoever,[11] or only later develop effects from the virus.

60.     In addition to—and sometimes separate from—the symptoms described above, the virus can also wreak havoc on patients' organs. COVID-19 can cause heart and liver failure, kidney damage, neurological deficits, and blood clots that can lead to severe and/or multiple strokes and limb amputation.[12] For example, researchers have found that the virus attacks certain brain cells directly while also reducing blood flow to brain tissue, causing long-term neurological damage.[13]

_to Usual Health Among Outpatients with COVID-19 in a Multistate Health Care Systems Network –United States, March-June 2020_, Morbidity and Mortality Weekly Report, July 31, 2020, https://www.cdc.gov/mmwr/volumes/69/wr/mm6930e1.htm (last visited August 23, 2021).

[10] CDC Interim Clinical Guidance, _supra_ note 8.

[11] _Id._

[12] Lenny Bernstein, Carolyn Y. Johnson, Sarah Kaplan and Laurie McGinley. _Coronavirus destroys lungs. But doctors are finding its damage in kidneys, hearts, and elsewhere_, The Washington Post (April 15, 2020), https://www.washingtonpost.com/health/coronavirus-destroys-lungs-but-doctors-are-finding-its-damage-in-kidneys-hearts-and-elsewhere/2020/04/14/7ff71ee0-7db1-11ea-a3ee-13e1ae0a3571_story.html (last visited August 20, 2021).

[13] Michael Marshall, _COVID and the brain: researchers zero in on how damage occurs_, Nature (July 7, 2021), https://www.nature.com/articles/d41586-021-01693-

61.     The full extent and longevity of the virus's effects on the human body also remain unclear and—because of the virus's novelty—largely unstudied. The research that has been conducted suggests that exposure to and contraction of COVID-19 leads to a wide range of medical outcomes, from a mild cough and/or sore throat to sustained cardiac, kidney, liver, neurological, respiratory, and circulatory damage.[14] And, as shown by the statistics reported above, many patients die as a result of contracting the virus.

62.     Research thus far has shown that patients who are believed to have "recovered" from COVID-19 continue to suffer life-altering and potentially life-threatening health problems. [15] For instance, one study found that at approximately 71 days after a positive COVID-19 test, irrespective of the severity of the patient's symptoms, the time of the original diagnosis, and any pre-existing conditions, 60% of patients evaluated showed signs of "ongoing myocardial inflammation." The same study discovered that 78% of patients demonstrated "cardiac involvement"— that is, these patients had abnormal cardiac readings associated with bad outcomes for cardiomyopathies.[16]

---

6 (last visited August 23, 2021).

[14] Tara Parker-Pope, *The Many Symptoms of Covid-19*, The New York Times, August 5, 2020, https://www.nytimes.com/2020/08/05/well/live/coronavirus-covid-symptoms.html (last visited August 22, 2021).

[15] *See*, *e.g.*, Diana Lindner, et al., *Association of Cardiac Infection With SARS-CoV-2 in Confirmed COVID-19 Autopsy Cases*, JAMA Cardiology, July 27, 2020, https://jamanetwork.com/journals/jamacardiology/fullarticle/2768914 (finding "virus progeny" in the heart of autopsied COVID-19 patients) (last visited August 22, 2021).

[16] Valentina O. Puntmann, et al., *Outcomes of Cardiovascular Magnetic Resonance Imaging in Patients Recently Recovered From Coronavirus Disease 2019 (COVID-19)*, JAMA Cardiology, July 27, 2020, https://jamanetwork.com/journals/jamacardiology/fullarticle/2768916 (last visited August 22, 2021).

SECOND AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES

63.     Additionally, some patients who initially experience only mild symptoms (or no symptoms) later suffer catastrophic damage, such as stroke,[17] severe blood clots,[18] and/or cardiac inflammation like that described above.

64.     And some people contract and carry the virus without manifesting or experiencing any initial symptoms. Due to the newness of the virus, research into its full range of effects on "asymptomatic" patients remains limited. Studies have not yet concluded with any certainty that these patients do not, in fact, suffer physical repercussions as a result of their having been exposed to and carried the virus. However, some medical experts and researchers have reported that these "asymptomatic" patients may in fact suffer long-term and/or later-manifesting harms.

65.     Such occurrences were described by Dr. Jon Drezner, Director of the University of Washington Medicine Center for Sports Cardiology in Seattle, team physician for the Seattle Seahawks, Seattle Reign, and University of Washington Huskies, and advisor to the NCAA on cardiac issues, on an August 11, 2020 CNN broadcast. Drezner explained that "early on in the pandemic we learned that COVID-19 can affect the heart. And about one in four hospitalized have heart injury and raised a lot of questions and concerns about patients who weren't in the hospital."  He continued by posing the question: "Would patients who have mild symptoms or no symptoms have heart injury?" and further explained that, "More recently we've been learning that some college and professional athletes are inflicted with myocarditis (inflammation of the heart which can trigger arrhythmia or cardiac arrest) from COVID-19."

---

[17] Ariana Eunjung Cha, Y*oung and middle-aged people, barely sick with covid-19 are dying of strokes*, The Washington Post, April 25, 2020, https://www.washingtonpost.com/health/2020/04/24/strokes-coronavirus-young-patients/ (last visited August 22, 2021).

[18] Parker-Pope, *The Many Symptoms of Covid-19*, *supra* note 14.

66.    Dr. Drezner confirmed that this potentially long-term damage can afflict someone who was asymptomatic or who experienced only a mild case of COVID-19 that did not require hospitalization. He said:  "We are learning that some athletes who really had no symptoms and go through subsequent testing are being diagnosed with myocarditis[,]" which is, in his words:  "inflammation of the heart muscle and it can lead to scar tissue in the heart.  And that scar tissue can be a focus for arrhythmia or even sudden cardiac arrest."[19]

67.    Likewise, a study that considers, among other things, the lingering impact of the virus on those with mild symptoms is currently underway at the University of California, San Francisco. Among the study's findings, is that children exposed to "adult relatives with flu-like symptoms" developed signs of Kawasaki disease, including lesions  on their feet and hands, *weeks or months* after that exposure.[20]

68.    Together, the multiple presentations of the virus, range of severity of symptoms—from asymptomatic to severe—the unavailability and inaccuracy of testing, along with the limited research about COVID-19 make it plausible that a person directly exposed to the virus, particularly for prolonged periods of time, like the passengers on the GRAND PRINCESS, will suffer long-lasting, and potentially life-altering or fatal health effects.

69.    As a result and a proximate cause of Defendants PRINCESS and CARNIVAL exposing Plaintiffs to COVID-19 aboard the GRAND PRINCESS, as described in more detail below, and because of the nature of the virus and its long-term health effects, Plaintiffs will require medical monitoring and diagnostic

---

[19] Interview on CNN Anderson Cooper 360 (August 11, 2020), transcript available at: http://transcripts.cnn.com/TRANSCRIPTS/2008/11/cnr.10.html

[20] Peter Fimrite, *Long after the illness is gone, damage from coronavirus may remain*, San Francisco Chronicle, May 31, 2020, https://www.sfchronicle.com/health/article/Long-after-the-illness-is-gone-the-damage-from-15305842.php (last visited August 20, 2021).

examinations into the future. This monitoring is required to diagnose, prevent, and/or treat current or future injury related to Plaintiffs' and Class members' exposure to, contraction of, illness and disease related to, asymptomatic contraction of, and potential contraction of COVID-19, in light of the evolving scientific understanding of the full risk and scope of health outcomes related to and/or resulting from the virus.

## II.     The COVID-19 Pandemic

70.     On January 20, 2020, the United States Centers for Disease Control and Prevention ("CDC") announced the first confirmed case of COVID-19 in the U.S.

71.     Since then, the number of confirmed cases in the U.S. has multiplied exponentially. When Plaintiffs filed their First Amended Complaint there were approximately 1.7 million cases in the United States. Now, there are over 37 million confirmed cases, and over 600,000 people have died in the United States alone. The death toll worldwide is reported to be more than 4 million people out of more than 200 million confirmed cases.

72.     The past winter was particularly harsh: on January 8, 2021, the CDC reported 312,325 new cases, the number of new cases in a single day since the start of the pandemic.[21]

73.     The full scope of the impact of this pandemic remains unknown, as reports have indicated that the numbers of cases and deaths may be significantly undercounted.[22] One reason for this undercounting is due to the unavailability and

---

[21] Ctrs. for Disease Control & Prevention, Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory [hereinafter "CDC COVID-19 Trends"], https://covid.cdc.gov/coviddata-tracker/#trends_dailytrendscases (last visited August 18, 2021).

[22] Berkeley Lovelace Jr., *Official U.S. coronavirus death toll is 'a substantial undercount' of actual tally, Yale study finds*, CNBC, July 1, 2020, https://www.cnbc.com/2020/07/01/official-us-coronavirus-death-toll-is-a-substantial-undercount-of-actual-tally-new-yale-study-finds.html (last visited

inaccuracy of COVID-19 diagnostic tests in the United States, particularly during the early days of the pandemic.[23] Indeed, the initial test designed by the CDC contained critical flaws, and the process of developing a more accurate test delayed widespread availability of COVID-19 tests by weeks.[24]

74.     Once testing became more widely available—though still not accessible to all those in need—it was, and has remained, inaccurate. In particular, experts warn of false negatives.[25] For instance, one San Francisco resident who traveled on Defendants' ship the DIAMOND PRINCESS reported taking over a dozen COVID-19 tests during a month-long period. The tests returned alternating results of positive and negative.[26]

75.     Despite the likely drastic undercounting of case and death statistics, the numbers make abundantly clear that COVID-19 spreads swiftly, and poses grave risks to individuals exposed to it.

76.     In December 2020, the U.S. Food and Drug Administration authorized three COVID-19 vaccines for emergency use.  Vaccines have played a vital role in slowing the spread of the virus. With the vaccine rollout in the U.S. in the spring of

---

August 17, 2021); Apoorva Mandavilli, *Actual Coronavirus Infections Vastly Undercounted, C.D.C. Data Shows*, New York Times, June 27, 2020 (updated August 6, 2020), https://www.nytimes.com/2020/06/27/health/coronavirus-antibodies-asymptomatic.html (last visited August 17, 2021).

[23] *See* Olga Khazan, *The 4 Key Reasons the U.S. Is So Behind on Coronavirus Testing*, The Atlantic, March 13, 2020, https://www.theatlantic.com/health/archive/2020/03/why-coronavirus-testing-us-so-delayed/607954/ (last visited August 17, 2021).

[24] Caroline Chen, Marshall Allen, Lexi Churchill, and Isaac Arnsdorf, *Key Missteps at the CDC Have Set Back Its Ability to Detect the Potential Spread of Coronavirus*, ProPublica, February 28, 2020, https://www.propublica.org/article/cdc-coronavirus-covid-19-test (last visited August 21, 2021).

[25] Lisa M. Krieger, *Coronavirus false tests results: With a push to screen come questions of accuracy*, The Mercury News, March 19, 2020, https://www.mercurynews.com/2020/03/19/coronavirus-false-test-results-with-the-push-to-screen-come-questions-of-accuracy/ (last visited August 17, 2021).

[26] *Id.*

2021, the number of new infections per day dropped significantly. On June 21, 2021, there were only 8,420 new reported cases.[27]

77.     Despite those improvements, the United States is currently experiencing yet another wave of infection surge. The number of new infections per day has been on the rise since late June, with 124,928 new cases reported on August 6, 2021. One cause of this surge is the rapid spread of the "Delta Variant," a highly-transmissible variant that is 50 percent more contagious than the initial strain.[28] The Delta Variant is now the predominant strain of COVID-19 threatening public health, comprising approximately 83.2 percent of recent U.S. cases.[29]

78.     Another cause of the recent infection surge is the slowing of individuals getting vaccinated. While the vaccination rate increased rapidly from January to May 2021, it has since remained relatively stagnant for several months.[30] Currently, only 50.9 percent of the U.S. population are fully vaccinated.[31]

## III.   Carnival and Princess Knew or Should Have Known the Risks of Viral Contagion Aboard Their Cruise Ships.

79.     On January 20, 2020, the United States Centers for Disease Control and Prevention ("CDC") announced the first confirmed case of COVID-19 in the U.S. Ten days later, on January 30, 2020, the CDC announced that it had identified, in Illinois, the first known instance of person-to-person spread (i.e. not related to travel outside of the United States).

---

[27] CDC COVID-19 Trends, *supra* note 21.

[28] Kathy Katella, *5 Things to Know About the Delta Variant*, Yale Medicine (Aug. 3, 2021); Ctrs. for Disease Control & Prevention, COVID Data Tracker Weekly Review (Aug. 6, 2021), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html.

[29] *Id.*

[30] *Id.*

[31] Ctrs. for Disease Control & Prevention, COVID-19 Vaccinations in the United States, https://covid.cdc.gov/covid-data-tracker/#vaccinations (last visited Aug. 18, 2021).

80.     Also on January 30, 2020, the World Health Organization ("WHO") declared COVID-19 a "Public Health Emergency of International Concern." According to WHO, a Public Health Emergency of International Concern is "an extraordinary event which is determined to constitute a public health risk to other States through the international spread of disease and to potentially require a coordinated international response."

81.     On January 31, 2020, the U.S. Secretary for Health and Human Services declared a public health emergency for "the entire United States to aid the nation's healthcare community in responding" to COVID-19.[32]

82.     In early February 2020, experts in the European Union, led by epidemiologist Dr. Christou Hadjichristodoulou, released specific guidelines for the cruise industry that included an outline of the risk of COVID-19 outbreaks aboard cruise ships and recommended response protocols.[33] Specifically, the guidelines directed that, in the event of a COVID-19 case, "close contacts" of the individuals believed to have COVID-19 should be quarantined in their cabin or on shore, and "casual contacts" should be disembarked from the ship.[34]

---

[32] Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus (Jan. 31, 2020), https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergencyus-2019-novel-coronavirus.html (last visited Sept. 30, 2020).

[33] Interim Advice for Preparedness and Response to Cases of Acute Respiratory Disease at Points of Entry in the European Union (EU) / EEA Member States (MS): Advice for ship operators for preparedness and response to the outbreak of 2019-nCoV acute respiratory disease, Feb. 3, 2020, https://www.gac.com/491364/siteassets/about-gac/coronavirus/eu-interim-advice_2019-ncov_maritime_4_2_2020_f.pdf (last visited April 6, 2020); *see also* Matt Apuzzo, Motoko Rich and David Yaffe-Bellany, *Failures on Diamond Princess Shadow Another Cruise Ship Outbreak*, The New York Times, March 8, 2020, https://www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html (last visited August 21, 2021).

[34] Healthy GateWays, Algorithm for decision making in response to an event of a suspect case of COVID-19, https://www.healthygateways.eu/Portals/0/plcdocs/Flow_chart_Ships_3_2_2020.pdf (last visited August 20, 2021).

83.     On February 12, 2020, the CDC issued guidance for ships on managing COVID-19.[35] The guidance noted that commercial shipping, including cruise ships, "involves the movement of large numbers of people in closed and semi-closed settings. Like other close-contact environments, ships may facilitate transmission of respiratory viruses from person to person through exposure to respiratory droplets or contact with contaminated surfaces." The guidance recommended "[i]dentifying and isolating passengers and crew with possible symptoms of COVID-19 as soon as possible." It also recommended that "[p]assengers and crew members who have had high-risk exposures to a person suspected of having COVID-19 should be quarantined in their cabins."

84.     Defendants CARNIVAL and PRINCESS represent to their customers and the general public that they have a commitment to "the health, safety, and security" of their passengers and promote their business as one that "always strives to be free of injuries, illness and loss."[36] They further assert that they "[s]upport a proactive framework of risk mitigation in the areas of HESS [Health, Environment, Safety, Security] aimed at preventing, monitoring and responding to threats."[37]

85.     However, in or before early February 2020, Defendants became aware of an outbreak of COVID-19 aboard the cruise ship the DIAMOND PRINCESS, which is owned and/or operated by CARNIVAL and PRINCESS. The outbreak originated on the DIAMOND PRINCESS while the vessel was docked in

---

[35] Interim Guidance for Ships on Managing 2019 Novel Coronavirus, Feb. 12, 2020 (updated Feb. 15), https://www.cdc.gov/quarantine/maritime/recommendations-for-ships.html (last visited August 22, 2021).

[36] Carnival Health, Environment, Safety, Security & Sustainability Policy & Governance, Carnival Health, Environment, Safety, Security & Sustainability Policy & Governance, https://www.carnivalcorp.com/leading-responsibly/health-environment-safety-security-sustainability-policy-governance/ (last visited August 21, 2021).

[37] Carnival Corporation & PLC Health, Environmental, Safety, Security, and Sustainability Corporate Policy, https://www.carnivalcorp.com/static-files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last visited August 21, 2021).

Yokohama, Japan. Ten cases were originally diagnosed, and that number rapidly escalated to over 700 cases—over one-fifth of the passengers and crew members onboard the ship at the time. Investigative reporting about the DIAMOND PRINCESS revealed that well after CARNIVAL and PRINCESS became aware of the first case aboard the ship, Defendants worked to "keep the fun going" by "encouraging [guests] to mingle."[38]

86.     To date, at least 14 of the DIAMOND PRINCESS's passengers have died as a result of COVID-19.[39]

87.     On February 13, 2020, Dr. Grant Tarling posted a "Diamond Princess Update" on Facebook, explaining that six days after learning that a man aboard the ship was diagnosed with COVID-19, "all guests and crew were evaluated for symptoms of the illness and the first batch of several hundred laboratory samples were taken from individuals with symptoms or suspected to have been exposed to the virus."[40]  Thus, Defendants were not only aware of the potential for outbreak, but also of steps that should be taken immediately after learning of a positive case onboard.

88.     Additionally, Dr. Tarling explained that Japanese health authorities "expected" there would be additional cases onboard the ship due to the exposure passengers and crew members experienced due to contact with the diagnosed individual and his close contacts.[41]  Obviously, Defendants knew that even just one

---

[38] Austin Carr and Chris Palmieri, *Socially Distance This: Carnival Executives Knew They Had a Virus Problem, But Kept the Party Going*, Bloomberg, April 16, 2020,  https://www.bloomberg.com/features/2020-carnival-cruise-coronavirus/ (last visited August 21, 2021).

[39] Lauren Smiley, *27 Days in Tokyo Bay: What Happened on the Diamond Princess*, Wired, May 13, 2020, https://www.wired.com/story/diamond-princess-coronavirus-covid-19-tokyo-bay/ (last visited August 20, 2021)..

[40] Diamond Princess Update: Dr. Grant Tarling, February 13, 2020, https://www.facebook.com/PrincessCruises/videos/203765767439746/ (last visited August 23, 2021).

[41] *Id.*

SECOND AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES

positive COVID-19 case onboard one of their cruise ships could expose and infect dozens or more other passengers, leading to an outbreak.

89.     What's more, Dr. Tarling's Facebook post identified the symptoms the medical staff onboard the ship were witnessing from those with COVID-19. Leadership at PRINCESS and CARNIVAL were well aware of what to look for in high risk situations, and knew how to advise passengers.[42] But, as Plaintiffs here would discover, Defendants' did not apply their lessons from the DIAMOND PRINCESS to subsequent cruises.

90.     In a February 18, 2020, update issued in response to the crisis aboard the DIAMOND PRINCESS, the CDC stated that "the rate of new reports of positives [now] on board, especially among those without symptoms, highlights the high burden of infection on the ship and potential for ongoing risk."[43]

91.     To date, cruises run by CARNIVAL and PRINCESS have been identified as responsible for more than 1,600 positive COVID-19 infections, and over 50 deaths.

## IV.  Carnival Undertook an Independent Duty of Care Toward Plaintiffs

92.     Through its public statements and conduct, Defendant CARNIVAL specifically undertook a duty to maintain a safe environment aboard the cruise ships in its fleet, including the GRAND PRINCESS.

93.     On its website, CARNIVAL prominently displays the PRINCESS name and logo, describing PRINCESS as part of its "family" of cruise line brands. CARNIVAL's website states that potential customers "need look no further than the Carnival family when selecting a cruise vacation."

---

[42] *Id.*

[43] *See* Centers for Disease Control and Prevention, Update on the Diamond Princess Cruise Ship in Japan, Feb. 18, 2020, https://www.cdc.gov/media/releases/2020/s0218-update-diamond-princess.html (last visited August 23, 2021).

94.     CARNIVAL represented to its customers and the general public that it had a commitment to "[p]rotecting the health, safety and security of our passengers, guests, employees and all others working on our behalf, thereby promoting an organization that always strives to be free of injuries, illness and loss. … [and] assigning health, environment, safety, security (HESS) and sustainability matters the same priority as other critical business matters."[44] They further assert that they "[s]upport a proactive framework of risk mitigation in the areas of HESS aimed at preventing, monitoring and responding to threats."[45]

95.     CARNIVAL promulgated HESS policies for all of its cruise line brands, including PRINCESS. CARNIVAL's HESS Corporate Policy, which is available to the public on CARNIVAL's website, states that CARNIVAL will "ensure compliance with this [HESS] policy within each of Carnival's Corporate and Operating Line organizations."[46]

96.     In 2018, CARNIVAL implemented a HESS event reporting platform to "standardize HESS event reporting and analysis capabilities across our entire fleet."[47] All of CARNIVAL's subsidiary brands, including PRINCESS, were required to report all cases of illness onboard a ship (according to criteria set by CARNIVAL) to CARNIVAL.

---

[44] Carnival Health, Environment, Safety, Security & Sustainability Policy & Governance, Carnival Health, Environment, Safety, Security & Sustainability Policy & Governance, https://www.carnivalcorp.com/leading-responsibly/health-environment-safety-security-sustainability-policy-governance/ (last visited August 23, 2021).

[45] Carnival Corporation & PLC Health, Environmental, Safety, Security, and Sustainability Corporate Policy, https://www.carnivalcorp.com/static-files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last visited August 23, 2021).

[46] *Id.*

[47] Sustainability from Ship to Shore, Carnival Corp. & PLC FY2018 Sustainability Report, https://safety4sea.com/wp-content/uploads/2019/06/Carnival-Corp.-Sustainability-From-Ship-to-Shore-2019_06.pdf (last visited August 23, 2021).

97.    The 2016 federal plea agreement noted that CARNIVAL "currently monitors and supervises environmental, safety, security, and regulatory requirements for Princess and other Carnival brands." Prior to the government investigation that led to the plea agreement, CARNIVAL had "undertaken steps to strengthen and enhance its oversight and compliance structure." For example, "the company initiated structural changes within its management organization, primary among which was the creation of a position titled 'Chief Maritime Officer,' placing the responsibility for overall environmental, safety, and security compliance in one individual …."

98.    In 2019, CARNIVAL announced that it was creating a new Chief Ethics and Compliance Officer "to further develop our ethics and compliance program across the entire corporation." CARNIVAL explained that "[i]t is important to note that the Ethics & Compliance is not just a single department within  All Brands Group – but rather a corporate-wide program – with key Ethics & Compliance Officers . . . who help shape and implement the program initiatives in each of the operating companies."

99.    Dr. Grant Tarling, CARNIVAL's Senior Vice President and Chief Medical Officer, provided multiple messages to the public on behalf of PRINCESS and CARNIVAL through YouTube and Facebook, regarding the status of the DIAMOND PRINCESS and about safety measures PRINCESS and CARNIVAL claimed to implement on PRINCESS ships.[48]

100.    Given these assurances and representations, CARNIVAL undertook an independent duty to abide by its commitments and to protect passengers on all of its cruise lines, including PRINCESS, from reasonably-avoidable hazards, such as

---

[48] *See*, *e.g.*, Diamond Princess Update: Dr. Grant Tarling, February 13, 2020, https://www.facebook.com/PrincessCruises/videos/203765767439746/ (last visited August 17, 2021); Dr. Grant Tarling Medical Update with Enhanced Screening and Preventive Health Measures, February 29, 2020, https://www.youtube.com/watch?v=kSOuXwmh9Lo (last visited August 17, 2021).

exposing passengers for a prolonged period of time on a ship known to be infested with a potentially-lethal virus.

## V.   <u>What Makes Cruise Ships Different From Other Businesses</u>

101.   Unlike shore-side businesses such as restaurants, retail shops, and grocery stores, "cruising raises unique risks of COVID-19 outbreaks, concerns that are now heightened due to the Delta Variant."[49] With these unique risks, as factual and legal matters, come additional attendant duties on the owners and operators of cruise ships.

102.   Cruise ships involve the movement of a large volume of individuals in close quarters for days and weeks and present many opportunities for person-to-person contact in crowded or indoor settings, such as group and buffet dining, entertainment events, and excursions,[50] as well as even more confined spaces such as elevators and public restrooms. Ship cabins are small, increasing the risk of transmission between cabinmates.[51] Similarly, the crew typically live and eat in small congregate places.[52]

103.   Moreover, passengers and crew interact with a myriad of shared, and frequently-touched surfaces, including but certainly not limited to the utensils used to serve food on buffet lines, elevator buttons, hand railings, chairs, cards and other game pieces, and door handles. The frequency with which individuals touch these surfaces along with the sheer number of people who come into contact with them in

---

[49] *Norwegian Cruise Line Holdings, Ltd. v. Rivkees*, No. 21-22492-CIV, 2021 WL 3471585, at *3 (S.D. Fla. Aug. 8, 2021).

[50] 85 Fed. Reg. at 16629–16630; *see also* J. Rocklov and H. Sjodin, *COVID-19 outbreak on the Diamond Princess cruise ship: estimating the epidemic potential and effectiveness of public health countermeasures*, Journal of Travel Medicine, (February 28, 2020), https://academic.oup.com/jtm/article/27/3/taaa030/5766334 (last visited August 18, 2021).

[51] *Id.*

[52] *Id.*

a limited period of time make cruise ships uniquely dangerous for the spread of viruses, including COVID-19.

104.   After embarkation, passengers are effectively trapped onboard. PRINCESS and CARNIVAL had a custodial role over their passengers, who had no option for safe and fast exit while the vessel remained at sea.

105.   CARNIVAL and PRINCESS also understood, based on their years of specific experience operating cruise ships, the limited air flow and low ventilation in the interior of cruise ships, and they knew that these conditions make airborne viruses all the more hazardous on board a ship, particularly where passengers are exposed for a lengthy period of time during a long-haul, open-water voyage.

106.   The combination of the aforementioned factors, among other factors, make cruise ships distinctly susceptible to rapidly and pervasively spreading pathogens in ways that differ from most other businesses. As the CDC determined, the COVID-19 outbreak aboard the DIAMOND PRINCESS "demonstrates the speed and extent of disease transmission that can occur onboard cruise ships."[53]

107.   The unique susceptibility of cruise ships to the rapid spread of viral illness was well-known to Defendants. Years before the COVID-19 outbreaks aboard the DIAMOND PRINCESS and GRAND PRINCESS, CARNIVAL and PRINCESS's own Group Senior Vice President and Chief Medical Officer Grant Tarling, M.D., M.P.H. co-authored an article that acknowledged that cruise ships "represent a potential source for introduction of novel or antigenically drifted influenza virus strains to the United States" and that cruise ship characteristics, such as "close quarters and prolonged contact among travelers on ships and during land-based tours before embarkation, increase the risk of communicable disease transmission."[54]

---

[53] No Sail Order and Suspension of Further Embarkation, 85 FR 16628-03

[54] Kimberly B. Rogers, MPH, Shahrokh Roohi, MPH, Timothy M. Uyeki, MD, *et al.*, *Laboratory-based respiratory virus surveillance pilot project on select cruise*

108.    A study published on February 28, 2020, echoed Dr. Tarling's findings, and highlights the unique conditions of cruise ships that "clearly amplified" the spread of COVID-19 among those onboard the Diamond Princess.[55] The study also revealed that extended periods of time on the ship without quarantine increased the spread of the virus.[56]

109.    PRINCESS and CARNIVAL were aware of passengers' reasonable reliance on them, and held themselves out as being committed to ensuring passengers' safety and well-being. CARNIVAL'S Health, Environment, Safety and Security Policy describes, in CARNIVAL's words, its "commitments to: Protecting the health, safety and security of our passengers, guests, employees and all others working on our behalf, thereby promoting an organization that always strives to be free of injuries, illness and loss. … [and] assigning health, environment, safety, security (HESS) and sustainability matters the same priority as other critical business matters."[57] Notably, this website specifically identifies PRINCESS as a part of CARNIVAL CORPORATION and CARNIVAL PLC, representing that the policy applies to the subsidiary as well as the parent.

110.    In furtherance of these commitments, CARNIVAL's HESS Corporate Policy states that the company will, among other things, "[s]upport a proactive framework of risk mitigation in the areas of HESS aimed at *preventing, monitoring, and responding to threats*."[58] It also states that CARNIVAL will "Promptly report

_____

*ships in Alaska, 2013-2015*, Journal of Travel Medicine 2017, 1-6, at 2 (2017).

[55] J. Rocklov and H. Sjodin, *COVID-19 outbreak on the Diamond Princess cruise ship*, *supra* note 50.

[56] *Id.*

[57] Carnival Corporation & PLC, Health, Environment, Safety, Security & Sustainability Policy & Governance, https://www.carnivalplc.com/leading-responsibly/health-environment-safety-security-sustainability-policy-governance (last visited August 23, 2021).

[58] *Id.* (emphasis added).

and properly investigate all HESS incidents and take appropriate action to prevent recurrence."[59]

111.   The PRINCESS website states that the "health and well-being of [its] guests and crew is [its] highest priority," and touts the availability of 24-hours on-call medical staff, and its protective measures and health facilities that "meet or exceed standards" set by the US Centers for Disease Control and the American College of Emergency Physicians.

112.   PRINCESS also points potential passengers to the Cruise Industry Passenger Bill of Rights, which explains that "Members of the Cruise Lines International Association are *dedicated to the comfort and care of all passengers* on oceangoing cruises throughout the world."[60]

113.   Given these assurances and representations, PRINCESS and CARNIVAL undertook a duty to abide by that commitment and to protect passengers from reasonably-avoidable hazards, such as exposing passengers for a prolonged period of time on a ship known to be infested with a potentially-lethal virus.

**VI.   The February 11, 2020 M/V GRAND PRINCESS Cruise to Mexico**

114.   Despite their awareness of the unique risks created by the cruise ship environment, and their experiences with COVID-19 outbreaks on other vessels, on February 11, 2020—approximately ten days after Defendants learned about the infection aboard the DIAMOND PRINCESS—Defendants boarded Plaintiffs and over 2,000 other passengers onto the GRAND PRINCESS for a roundtrip voyage to Mexico without conducting any effective medical screenings for passengers and

---

[59] *Id.*

[60] Princess, Cruise Industry Passenger Bill of Rights, www.princess.com/legal/bill_of_rights/ (last visited August 20, 2021) (emphasis added).

without providing any additional information about best practices to mitigate or prevent the spread of COVID-19.

115.   On February 13, 2020, Dr. Nadia Nair, the ship's doctor, warned Defendants of an increase in Influenza-like illness (ILI) among crew since the beginning of the cruise.

116.   On February 15, 2020, Dr. Nair again warned of a "concerning" increase in ILI among crew and passengers and asked Defendants whether "any additional measures need to be implemented."

117.   Nevertheless, upon information and belief, throughout the course of the 10-day voyage to Mexico, Defendants did not alter their on-ship protocols, event itineraries, or cleaning and disinfectant practices in order to prevent the spread of COVID-19. Defendants did not, for example, institute any medical examination or screening procedures for passengers leaving and returning to the ship at any of the GRAND PRINCESS's ports of call. Nor did Defendants provide passengers onboard the GRAND PRINCESS any information about COVID-19.

118.   On or around February 19, 2020, PRINCESS and CARNIVAL became aware of at least one passenger suffering from COVID-19 symptoms onboard the GRAND PRINCESS, but neither Defendant alerted Plaintiffs or other passengers aboard the ship, and did not put into place any quarantine requirements or shelter-in-place and social distancing protocols.

119.   According to PRINCESS's and CARNIVAL's Chief Medical Officer, Grant Tarling, MD, MPH, Defendants believed the infected passenger was carrying the virus when he boarded the GRAND PRINCESS on February 11, 2020, but because Defendants did not provide any effective method of screening for passengers at the time of boarding, Defendants were unaware of his condition.[61]

---

[61] Thomas Fuller, John Eligon, and Jenny Gross, *Cruise Ship, Floating Symbol of America's Fear of Coronavirus, Docks in Oakland*, The New York Times, March 9, 2020, https://www.nytimes.com/2020/03/09/us/coronavirus-cruise-ship-oakland-

120.   Dr. Tarling reported that the infected passenger sought medical treatment from the medical center onboard the GRAND PRINCESS on February 20, 2020. The passenger reported suffering from "acute respiratory distress" for about a week before seeking treatment. Dr. Tarling did not say whether the passenger had sought any medical help prior to February 20, 2020. Upon information and belief, this information would have triggered mandatory reporting under 42 C.F.R. 71.1 *et seq.* and constitutes a "hazardous condition" per 33 C.F.R. § 160.216.[62]

121.   Upon information and belief, at least nine passengers and thirteen crew members on the GRAND PRINCESS's Mexico trip reported to the ship's medical center with "Influenza-like illness" (ILI). Twelve of the individuals suffering from ILI were tested for influenza; all twelve tested negative for influenza, which should have raised alarms about the possibility that they were infected with COVID-19. Moreover, Defendants knew that at least three crew members who became ill with ILI had joined the cruise via international flights with close contacts to Asia and, specifically, with China.

122.   At least 100 passengers who traveled on board the GRAND PRINCESS have tested positive for COVID-19, and at least two passengers who

---

grand-princess.html (last visited August 23, 2021).

[62] Section 160.216 requires that "[w]henever there is a hazardous condition … on board a vessel or caused by a vessel or its operation, the owner, agent, master, operator, or person in charge must immediately notify the nearest Coast Guard Sector Office . . . ." A"[h]azardous condition means any condition that may adversely affect the safety of any vessel … or the environmental quality of any port, harbor, or navigable waterway of the United States. It may, but need not, involve … injury *or illness of a person aboard* … ." 33 CFR § 160.202 (emphasis added).

traveled on the GRAND PRINCESS's Mexico trip died after disembarking.[63] One of these fatalities was the first-reported death caused by COVID-19 in California.[64]

123.   On February 21, 2020, the GRAND PRINCESS arrived at port in San Francisco and most of the passengers from the Mexico trip disembarked.  Some passengers, including Plaintiffs Brian Losie, Peggy Losie, Kenneth Prag, and Stephen Collins, remained onboard to travel on the ship's subsequent voyage headed to Hawaii.

124.   On March 4, 2020, Defendants alerted passengers who had embarked upon the Hawaii-bound trip aboard the GRAND PRINCESS on February 21, 2020, about a "small cluster of COVID-19 cases in Northern California" related to Plaintiffs' Mexico-bound trip aboard the ship. Upon information and belief, Defendants knew before or by that time that GRAND PRINCESS passengers on the February 21, 2020, voyage were currently suffering from COVID-19 and that there was a potential outbreak.

125.   On or about March 4, 2020, Defendants asked passengers who traveled on both the Mexico and Hawaii trips, including Plaintiffs Brian Losie, Peggy Losie, and Kenneth Prag, to quarantine in their cabins.

---

[63] Mark Berman, *Two Grand Princess passengers die from coronavirus, officials say*, The Washington Post, March 25, 2020, https://www.washingtonpost.com/nation/2020/03/25/two-grand-princess-passengers-died-coronavirus-officials-say/ (last visited August 23, 2021).

[64] It has since been discovered that other Californians suffered from and died as a result of COVID-19 prior to the February 11, 2020 cruise aboard the M/V GRAND PRINCESS. Nevertheless, the death of a Placer County resident who traveled on the M/V GRAND PRINCESS's February 11, 2020 cruise to Mexico spurred the state's initial stay-at-home orders. *See* Placer County Announces Death of Patient with COVID-19, March 4, 2020, https://www.placer.ca.gov/6438/Death-of-patient-with-COVID-19 (last visited August 23, 2021); Bill Chapel, *Coronavirus Deaths in Washington and California, Where Gov. Declares Emergency*, NPR, March 4, 2020, https://www.npr.org/sections/health-shots/2020/03/04/812121540/coronavirus-los-angeles-declares-emergency-and-u-s-reports-80-cases-in-13-states (last visited August 23, 2021).

126.    On or around March 6, 2020—two weeks after most Plaintiffs disembarked from their trip, and even longer after Defendants became aware that a passenger was suffering from COVID-19 symptoms onboard—passengers that had traveled onboard the Grand Princess from February 11 through February 21, including Plaintiffs, received a letter from Defendants alerting them that they may have been exposed to COVID-19 while onboard the GRAND PRINCESS.

127.    Plaintiffs and other passengers who continued onboard the GRAND PRINCESS for the Hawaii-leg of the cruise were forced to remain quarantined in their cabins until on or about March 9, 2020, when the vessel was finally allowed to dock at the port of Oakland.  Following disembarkation, Plaintiffs and other passengers that traveled to Hawaii were forced to spend approximately two weeks at government facilities, such as Travis Air Force base.

128.    If Plaintiffs had known the serious and actual risks of contracting or spreading COVID-19 while onboard the GRAND PRINCESS, Plaintiffs would not have sailed on the February 11, 2020, roundtrip voyage to Mexico. Or, at minimum, if they had been made aware after embarkation of the growing and continued risk, they would have disembarked from the ship at one of its ports of call.  Plaintiffs who remained onboard the GRAND PRINCESS after February 21, 2020, to travel to Hawaii would not have done so.

**VII.   The Passage Contract**

129.    The Passage Contract provided to Plaintiffs and Class members prior to the embarkation of the cruise purports to govern Plaintiffs' claims and available remedies.

130.    The Passage Contract is a standardized contract of adhesion written by Defendants and provided to Plaintiffs and Class members with no opportunity for review or negotiation.

131.   The Passage Contract is unfairly one-sided, against public policy, unconscionable and, as such, in unenforceable.

132.   Plaintiffs and Class members did not receive the Passage Contract , if at all, until well after 90 days prior to the subject cruise. Providing the Passage Contract to passengers at this late date constitutes surprise and is procedurally unconscionable.

133.   After 90 days, Plaintiffs could not cancel their cruise without being subject to a cancellation fee, the full cost of which escalated as the date of the cruise approached.

134.   Princess advertises its "standard cancellation policy" for sailings of 6 to 24 days—which includes the cruise that is the subject of this action—as charging 100% of all total charges if a passengers cancels within 14 days of the voyage.

135.   For cancellations made between 29 and 56 days prior to the voyage, Princess charges a fee equivalent to 50% of total charges, and for cancellations made between 15 and 28 days prior to the voyage, a 75% fee is charged.  This amounts to thousands of dollars Plaintiffs and Class members would be forced to pay if, upon receipt of the Passage Contract, they refused to be subject to its terms.

136.   Plaintiffs were not reasonably informed of the Passage Contract, including its class waiver provision. If they had been reasonably informed, their only recourse to reject the provision would have required canceling their reservations, which would have subjected Plaintiffs to potentially thousands of dollars in monetary penalties, including forfeiture of their deposits and/or purchase amount. The effect of delivering this standard, un-negotiated contract, to passengers at such a late date was to force Plaintiffs to accept the terms of the Passage Contract with no viable recourse.

137.   By purporting to strip Plaintiffs and Class members of their rights to pursue class action litigation, PRINCESS and CARNIVAL effectively give

themselves license to engage in bad business practices and dangerous and/or negligent conduct, regardless of whether it will harm passengers in the aggregate, because Defendants know that it will be impossible for *all* passengers to file suit and seek a remedy for their injuries.

## VIII.  The CDC'S Definition of a "Probable Case"

138.   In an April 5, 2020 position statement, the CDC and the Council of State and Territorial Epidemiologists ("CSTE") provided an "interim case definition" for COVID-19 for the purposes of counting and tracking "probable" and "confirmed" COVID-19 cases in the United States.[65]

139.   The interim definition provided three alternative clinical measures for evaluating a patient.

140.   First, a case meets the clinical criteria if there is no alternative more likely diagnosis and at least two of the following symptoms are present:  fever (measured or subjective), chills, rigors, myalgia, headache, sore throat, or new olfactory and taste disorder(s).

141.   Second, a case meets the clinical criteria if there is no alternative more likely diagnosis and at least one of the following symptoms are present:  cough, shortness of breath, or difficulty breathing.

142.   Third, a case meets the clinical criteria if there is no alternative more likely diagnosis and a patient suffers from severe respiratory illness with at least one of either clinical or radiographic evidence of pneumonia or acute respiratory distress syndrome.

---

[65] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19) 2020 Interim Case Definition, Approved April 5, 2020, https://wwwn.cdc.gov/nndss/conditions/coronavirus-disease-2019-covid-19/case-definition/2020/ (last visited August 14, 2020).

143.    The interim definition also provided that a case meets the laboratory criteria if there are positive results returned from a diagnostic test, an antigen test, or an antibody test.

144.    And, the CDC and CSTE identified a number of "epidemiological" criteria that should be considered when evaluating a potential COVID-19 case. Specifically, whether the patient was within 6 feet for 10 to 30 minutes or more with a person who has a confirmed or probable COVID-19 case; whether the patient was within 6 feet for 10 to 30 minutes or more with a person with a "clinically compatible illness" and some link exists to a confirmed COVID-19 case; whether the patient traveled to or resided in an area with sustained, ongoing community transmission of COVID-19; and/or whether the patient is a member of an at-risk cohort.

145.    Patients who meet both the clinical and epidemiological criteria are considered probable COVID-19 cases, as are those patients who presumptively meet the laboratory critera and either the clinical or epidemiological criteria.

146.    The position statement also recognized that "field investigations will involve evaluations of persons with *no symptoms* and *these individuals will need to be counted as cases*."

147.    In addition to the above-listed clinical criteria, the CDC has published more up-to-date information regarding the range of symptoms created by COVID-19. This list, which the CDC concedes is not comprehensive, includes:

    a.    Fever or chills

    b.    Cough

    c.    Shortness of breath or difficulty breathing

    d.    Fatigue

    e.    Muscle or body aches

    f.    Headache

g.      New loss of taste or smell

h.      Sore throat

i.      Congestion or runny nose

j.      Nausea or vomiting

k.      Diarrhea[66]

## IX.    Plaintiff's Medical Experiences

148.   Plaintiffs were all exposed, in close proximity for extended periods of time, to individuals who were or were probably carrying COVID-19, including crew members onboard the GRAND PRINCESS and their fellow passengers. Likewise, for almost two weeks, Plaintiffs effectively "resided in" a community—the cruise ship—that experienced sustained and ongoing transmission, as is evidenced by the vast number of passengers onboard the vessel who became ill with COVID-19. Most Plaintiffs also suffered symptoms in line with the clinical criteria identified by the CDC and CSTE.

149.   Before boarding the GRAND PRINCESS, Plaintiff CYNTHIA LYNN FORD was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside North America in the two weeks prior to boarding.

150.   While onboard the GRAND PRINCESS, Ms. Ford was exposed to COVID-19 when she attended events and activities where she was in close proximity to numerous other passengers and crewmembers, some of whom were infected with COVID-19.

151.   On or around February 17, 2020, Ms. Ford began to suffer from chills, severe vomiting, diarrhea, severe vertigo, fever, body aches, earache, a sore and scratchy throat, nausea, and an inability to sleep. She tested positive for COVID-19.

---

[66] Center for Disease Control and Prevention, Symptoms of Coronavirus, Updated Feb. 22, 2021, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html# (last visited August 20, 2021).

SECOND AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES

Based on her positive test results, the timing of the onset of her symptoms, and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that Ms. Ford contracted COVID-19 during the subject voyage.

152.   Before boarding the GRAND PRINCESS, Plaintiff JAMES DAVID ARTHUR FORD was not exhibiting any symptoms of COVID-19 nor had he been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. He had not travelled outside North America in the two weeks prior to boarding.

153.   While onboard the GRAND PRINCESS, Mr. Ford was exposed to COVID-19 when he attended events and activities where he was in close proximity to numerous other passengers and crewmembers, some of whom were infected with COVID-19.

154.   On or around February 21, 2020, Mr. Ford began to suffer from a sore throat and tested positive for COVID-19. Based on the timing of the onset of his symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that Mr. Ford contracted COVID-19 during the subject voyage.

155.   Before boarding the GRAND PRINCESS, Plaintiff CAROLE KEALY was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside North America in the two weeks prior to boarding.

156.   While onboard the GRAND PRINCESS, Ms. Kealy was exposed to COVID-19 when she attended events and activities where she was in close proximity to numerous other passengers and crewmembers, some of whom were infected with COVID-19.

157.   On or around February 14, 2020, Ms. Kealy began to suffer from fever, fatigue, night sweats, sleep apnea, a dry throat, insomnia, and sweating. Based on the timing of the onset of her symptoms and the CDC's definition of a

"probable case" of COVID-19, it is more likely than not that Ms. Kealy contracted COVID-19 during the subject voyage.

158.   Before boarding the GRAND PRINCESS, Plaintiff KELLY SANDOVAL was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside North America in the two weeks prior to boarding.

159.   While onboard the GRAND PRINCESS, Ms. Sandoval was exposed to COVID-19 when she attended events and activities where she was in close proximity to numerous other passengers and crewmembers, some of whom were infected with COVID-19.

160.   On or around February 19, 2020, Ms. Sandoval began to suffer from vertigo, a sore throat, the loss of her voice, and headaches. Based on the timing of the onset of her symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that Ms. Sandoval contracted COVID-19 during the subject voyage.

161.   Before boarding the GRAND PRINCESS, Plaintiff RUBEN SANDOVAL was not exhibiting any symptoms of COVID-19 nor had he been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. He had not travelled outside North America in the two weeks prior to boarding.

162.   While onboard the GRAND PRINCESS, Mr. Sandoval was exposed to COVID-19 when he attended events and activities where he was in close proximity to numerous other passengers and crewmembers, some of whom were infected with COVID-19.

163.   On or around February 29, 2020, Mr. Sandoval began to suffer from headaches, body aches, congestion, and other flu-like symptoms. He tested positive

for COVID-19. Based on his positive test, the timing of the onset of his symptoms, and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that Mr. Sandoval contracted COVID-19 during the subject voyage.

164.   Before boarding the GRAND PRINCESS, Plaintiff SARAH DAVIES was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside North America in the two weeks prior to boarding.

165.   While onboard the GRAND PRINCESS, Ms. Davies was exposed to COVID-19 when she attended events and activities where she was in close proximity to numerous other passengers and crewmembers, some of whom were infected with COVID-19.

166.   During or shortly after her time on the GRAND PRINCESS, Ms. Davies began to suffer from a runny nose and a sore throat. Based on the timing of the onset of her symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that Ms. Davies contracted COVID-19 during the subject voyage.

167.   Before boarding the GRAND PRINCESS, Plaintiff LARRY A. FISHER was not exhibiting any symptoms of COVID-19 nor had he been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. He had not travelled outside North America in the two weeks prior to boarding.

168.   While onboard the GRAND PRINCESS, Mr. Fisher was exposed to COVID-19 when he attended events and activities where he was in close proximity to numerous other passengers and crewmembers, some of whom were infected with COVID-19.

169.   On or around February 18, 2020, Mr. Fisher began to suffer from a sore throat, severe weakness, and an eye infection. He tested positive for COVID-19. Based on his positive test result, the timing of the onset of his symptoms, and

the CDC's definition of a "probable case" of COVID-19, it is more likely than not that Mr. Fisher contracted COVID-19 during the subject voyage.

170.    Before boarding the GRAND PRINCESS, Plaintiff RITA FISHER was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside North America in the two weeks prior to boarding.

171.    While onboard the GRAND PRINCESS, Ms. Fisher was exposed to COVID-19 when she attended events and activities where she was in close proximity to numerous other passengers and crewmembers, some of whom were infected with COVID-19.

172.    On or around March 4, 2020, Ms. Fisher began to suffer from nose bleeds, a severe cough, dry heaves, vomiting, pneumonia, and suffered multiple strokes. Ms. Fisher tested positive for COVID-19. She was admitted to the intensive care unit ("ICU") at Valley Care Hospital and remained in the ICU until June 12, 2020—approximately three months after passengers disembarked from the Grand Princess. While in the ICU, she was placed on a ventilator, had a tracheotomy, had a feeding tube inserted, and experienced fever, blood and urine in her stool, and fluid in her lungs. Since being released, she has suffered from continued vision problems in her right eye, cognitive issues, which are being monitored by a neurologist, and continues to require physical therapy due to loss of movement in her right hand resulting from the multiple strokes she experienced. She sees an occupational therapist to aid in her day-to-day functions, requires the use of a cane in order to walk, and has nerve damage in her legs and feet. Based on her positive test result, the timing of the onset of her symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that Ms. Fisher contracted COVID-19 during the subject voyage.

173.   Before boarding the GRAND PRINCESS, Plaintiff DAVID GONSALVES was not exhibiting any symptoms of COVID-19 nor had he been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. He had not travelled outside North America in the two weeks prior to boarding.

174.   While onboard the GRAND PRINCESS, Mr. Gonsalves was exposed to COVID-19 when he attended events and activities where he was in close proximity to numerous other passengers and crewmembers, some of whom were infected with COVID-19.

175.   On or around February 25, 2020, Mr. Gonsalves began to suffer from a cough, fatigue, lethargy, loss of appetite, and cognitive confusion. Based on the timing of the onset of his symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that Mr. Gonsalves contracted COVID-19 during the subject voyage.

176.   Before boarding the GRAND PRINCESS, Plaintiff MARY ANN GONSALVES was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside North America in the two weeks prior to boarding.

177.   While onboard the GRAND PRINCESS, Ms. Gonsalves was exposed to COVID-19 when she attended events and activities where she was in close proximity to numerous other passengers and crewmembers, some of whom were infected with COVID-19.

178.   On or around February 25, 2020, Ms. Gonslaves began to suffer from dry cough, fatigues, and lethargy. Based on the timing of the onset of her symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that Ms. Gonslaves contracted COVID-19 during the subject voyage.

179.   Before boarding the GRAND PRINCESS, Plaintiff TRACIE LING was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside North America in the two weeks prior to boarding.

180.   While onboard the GRAND PRINCESS, Ms. Ling was exposed to COVID-19 when she attended events and activities where she was in close proximity to numerous other passengers and crewmembers, some of whom were infected with COVID-19.

181.   During or shortly after her time on the GRAND PRINCESS, Ms. Ling began to suffer from a sore throat and body aches. Based on the timing of the onset of her symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that Ms. Ling contracted COVID-19 during the subject voyage.

182.   Before boarding the GRAND PRINCESS, Plaintiff PEGGY LOSIE was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside North America in the two weeks prior to boarding.

183.   While onboard the GRAND PRINCESS, Ms. Losie was exposed to COVID-19 when she attended events and activities where she was in close proximity to numerous other passengers and crewmembers, some of whom were infected with COVID-19.

184.   On or around February 16, 2020, Ms. Losie began to suffer from a persistent cough, which became progressively worse. On or about February 28, 2020, she went to the medical center and was prescribed Tamiflu tablets, issued an inhaler, and treated on a nebulizer.  The medical center checked her temperature twice daily and she was asked to remain confined to her quarters until the evening of February 29, 2020.  At that time, the Ship nurse declared Ms. Losie free to

1    resume normal activities. Ms. Losie chose to self-isolate for the next two days

2    because she continued to feel ill and her symptoms had not subsided. Ms. Losie

3    suffered from severe fatigue, sore throat, a persistent and progressively-worsening

4    cough, cognitive "fogginess," vomiting, respiratory discomfort, and lowered

5    appetite. Based on the timing of the onset of her symptoms and the CDC's

6    definition of a "probable case" of COVID-19, it is more likely than not that Ms.

7    Loise contracted COVID-19 during the subject voyage.

8           185.   Before boarding the GRAND PRINCESS, Plaintiff MARIE RIVERA

9    was not exhibiting any symptoms of COVID-19 nor had she been exposed to

10   anyone who had been diagnosed with or who exhibited symptoms of COVID-19.

11   She had not travelled outside North America in the two weeks prior to boarding.

12          186.   While onboard the GRAND PRINCESS, Ms. Rivera was exposed to

13   COVID-19 when she attended events and activities where she was in close

14   proximity to numerous other passengers and crewmembers, some of whom were

15   infected with COVID-19.

16          187.   On or around February 17, 2020, Ms. Rivera began to suffer from a

17   fever, chills, headache, sore throat, muscle aches, dry cough, shortness of breath,

18   chest tightness. Based on the timing of the onset of her symptoms and the CDC's

19   definition of a "probable case" of COVID-19, it is more likely than not that Ms.

20   Rivera contracted COVID-19 during the subject voyage.

21          188.   Before boarding the GRAND PRINCESS, Plaintiff PAUL RIVERA

22   was not exhibiting any symptoms of COVID-19 nor had he been exposed to anyone

23   who had been diagnosed with or who exhibited symptoms of COVID-19. He had

24   not travelled outside North America in the two weeks prior to boarding.

25          189.   While onboard the GRAND PRINCESS, Mr. Rivera was exposed to

26   COVID-19 when he attended events and activities where he was in close proximity

27

28

SECOND AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES

to numerous other passengers and crewmembers, some of whom were infected with COVID-19.

190.    On or around February 24, 2020, Mr. Rivera began to suffer from a fever, chills, headaches, and fatigue. Based on the timing of the onset of his symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that Mr. Rivera contracted COVID-19 during the subject voyage.

191.    Before boarding the GRAND PRINCESS, Plaintiff JUDITH SHATERIAN was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside North America in the two weeks prior to boarding.

192.    While onboard the GRAND PRINCESS, Ms. Shaterian was exposed to COVID-19 when she attended events and activities where she was in close proximity to numerous other passengers and crewmembers, some of whom were infected with COVID-19.

193.    On or around February 16, 2020, Ms. Shatrian began to suffer from a respiratory infection, which was so severe she went to the emergency room. Based on the timing of the onset of her symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that Ms. Shaterian contracted COVID-19 during the subject voyage.

194.    As a direct and proximate result of their negligence and gross negligence Defendants exposed Plaintiffs and Class Members to COVID-19, actual risk of immediate physical injury, and, in many cases, already-manifested actual physical injury.  As a direct and proximate result of their exposure to COVID-19, Plaintiffs and Class Members have suffered physical injuries as described above, as well as emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited

to, suffering anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame.

195. In addition, Plaintiffs and Class Members were traumatized by their direct exposure to COVID-19, the risk that they would contract the virus, and the reasonable apprehension associated with that risk.

196. Furthermore, as noted above, public health experts and physicians continue to learn more about the myriad ways COVID-19 attacks and damages the body, including long-lasting harms to the cardiovascular system,[67] and to the kidneys, liver, and neurological system, potentially even in "asymptomatic" patients.

197. Plaintiffs and Class Members develop new and evolving medical concerns and uncertainties that require and will continue to require medical diagnostic exams. Plaintiffs and the Class Members are suffering and will continue to suffer due to the ever-present anxiety and reasonable apprehension that they will or may later experience negative health outcomes or complications as a direct and proximate result of being exposed to COVID-19 because of Defendants' negligent and grossly negligent acts and omissions.

198. It is expected that, as a result of Defendants' negligence and gross negligence, they will continue to suffer and will, in the future, require medical services outside of the kinds accepted as part of the typical wear and tear of daily life.

---

[67] Valentina O. Puntmann, et al., *Outcomes of Cardiovascular Magnetic Resonance Imaging in Patients Recently Recovered From Coronavirus Disease 2019 (COVID-19)*, JAMA Cardiology, July 27, 2020, https://jamanetwork.com/journals/jamacardiology/fullarticle/2768916 (last visited August 23, 2021).

**REQUEST FOR INJUNCTIVE RELIEF**

199.   Plaintiffs traveled on the GRAND PRINCESS, a cruise ship owned and operated by CARNIVAL and PRINCESS. In the future, Plaintiffs intend to go on cruises again, including cruises operated by Defendants.

200.   Indeed, Plaintiffs DAVID and MARY ANN GONSALVES and JOHN and JUDITH SHATERIAN have already booked and intend to take a PRINCESS cruise to Hawaii departing on January 16, 2022.

201.   Plaintiffs KENNETH PRAG and STEPHEN COLLINS have already booked and intend to take several cruises in the future, including a November 7, 2021 PRINCESS cruise to Hawaii and a January 6, 2022 PRINCESS cruise to Mexico.

202.   As the events subsequent to the Subject Cruise have shown, however, Plaintiffs face a threat of imminent or actual harm when they cruise again, because they cannot rely on Defendants to faithfully inform them of risks of contracting COVID-19 aboard their cruise ships nor can they rely on Defendants' assurances that they are taking all reasonable measures to protect passengers from future onboard outbreaks.

203.   On March 14, 2020, the CDC determined that "[c]ruise ship travel markedly increases the risk and impact of the COVID-19 disease outbreak within the United States" and issued a "No Sail Order," which prohibited cruise ship operators from continuing operations unless approved by the U.S. Coast Guard in consultation with the CDC.[68] The No Sail Order was extended three times before expiring on October 31, 2020.[69]

204.   On November 4, 2020, the CDC issued a "Conditional Sailing Order" (CSO), which established a four-step framework for a "phased resumption of cruise

---

[68] 85 Fed. Reg. at 16630-31.

[69] *Id.* at 62739.

SECOND AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES

ship passenger operations."[70] The steps included: (1) establishing "laboratory testing of crew onboard cruise ships in the U.S. waters"; (2) performing "simulated voyages designed to test a cruise ship operators' ability to mitigate COVID-19 on cruise ships"; (3) completing "a certification process"; and (4) resuming restricted passenger voyages in a manner that mitigates the spread of COVID-19.[71] The CSO remains effective until November 1, 2021.[72]

205. While the CSO outlined a path for cruise lines to resume sailing while mitigating the risks of spreading COVID-19, the cruise industry, including Defendants, urged the CDC to lift the CSO so that cruises could resume by July, 2021.[73] Indeed, CARNIVAL threatened to move the ships its subsidiary, Carnival Cruise Lines, out of U.S. homeports if CDC did not lift the CSO.[74]

206. The CDC declined to lift the CSO, stating that "[c]urrent scientific evidence suggests that, absent mitigation measures of the type needed to prevent further transmission, cruise ships would continue to pose a greater risk of COVID-19 transmission than other settings."[75]

207. The CDC stated further that "[p]ublic health oversight is further needed to correct a market failure stemming from information asymmetry, i.e., the

---

[70] *Id.* at 70153.

[71] *Id.* at 70157.

[72] *Id.* at 70163.

[73] Morgan Hines, *Cruise industry calls on CDC to lift 'outdated' restrictions, allow US cruising by July,* USA Today (March 24, 2021),https://www.usatoday.com/story/travel/cruises/2021/03/24/covid-travel-restrictions-cruise-industry-pushes-cdc-over-outdated-cruising-rules/6978926002/ (last visited August 19, 2021).

[74] Morgan Hines, *Carnival Cruise Line threatens to remove its ships from US home ports to sail elsewhere*, USA Today (April 6, 2021), https://www.usatoday.com/story/travel/cruises/2021/04/06/carnival-cancels-sailings-threatens-remove-ships-from-us-ports/7110512002/ (last visited August 19, 2021).

[75] Framework for Conditional Sailing and Initial Phase COVID-19 Testing Requirements for Protection of Crew, 85 FR 70153-01.

public is often not fully informed in such a way to adequately determine the extent to which any given measure mitigates their personal risk, particularly in light of asymptomatic cases."[76]

208.   The CDC also stated that epidemiologic and other data "support a reasonable belief that cruise ships are or may be infected or contaminated with a quarantinable communicable disease." As a result, "absent measures of the type needed to mitigate further transmission, persons on board or seeking to board cruise ships may likely be or would likely become infected with or exposed to COVID-19 by virtue of being on board at a time when cases of COVID-19 continue to be reported in increasingly significant numbers globally."[77]

209.   Nevertheless, the CDC responded to criticism from the cruise ship industry by issuing a series of instructions intended provide cruise lines with additional options and more lenient requirements to phase in the resumption of cruising.[78]

210.   On April 8, 2021, the state of Florida filed a lawsuit in the Middle District of Florida against the CDC seeking to strike down the CSO and its subsequent instructions.[79] On June 18, 2021, the court issued a preliminary injunction prohibiting the CDC from "enforcing against a cruise ship arriving in, within, or departing from a port in Florida the Conditional Sailing Order" and subsequent instructions.[80] The CSO was stayed in Florida until July 18, 2021, at

---

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Florida v. Becerra*, No. 8-21-CIV-839-SDM, 2021 WL 1345392 (M.D. Fla. April 8, 2021).

[80] *Florida v. Becerra*, -- F.Supp.3d --, 2021 WL 2514138, at *51 (M.D. Fla. June 18, 2021).

SECOND AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES

which point the CSO and subsequent instructions issued by the CDC would exist only as a "non-binding consideration, recommendation, or guideline."[81]

211.   On appeal to the Eleventh Circuit, the CDC sought a stay of the injunction, pending resolution of the appeal.[82] On July 17, 2021, the Eleventh Circuit granted the CDC's request for a stay.[83] However, on July 23, 2021, the Eleventh Circuit reversed course by vacating the July 17 order and denying the request for a stay.[84] Without a further stay, the CSO and subsequent CDC instructions now appear to be non-binding guidelines for cruise ships, at least those departing from and arriving to Florida ports.

212.   In the absence of binding, evidence-based safety guidelines for preventing COVID-19 infection on cruise ships and with the number of cases again surging in the U.S., Plaintiffs face a threat of imminent or actual harm when they cruise again, because they cannot rely on Defendants to accurately inform them of risks of contracting COVID-19 aboard their cruise ships nor can they rely on Defendants' assurances that they are taking all reasonable measures to protect passengers from future onboard outbreaks.

213.   CARNIVAL and PRINCESS previously asserted their commitment to passengers' safety, well-being, and comfort and assured certain Plaintiffs that they would institute particular screening measures, but then failed to do so, and failed to take other effective measures to ensure that Plaintiffs were not exposed to COVID-19. This negligence led to multiple outbreaks onboard vessels owned by PRINCESS and CARNIVAL, including but not limited to the GRAND PRINCESS.

---

[81] *Id.* (internal quotations omitted).

[82] *Florida v. Sec'y, Dep't of Health & Hum. Servs.*, No. 21-12243 (11th Cir. July 6, 2021).

[83] *Sec'y, Dep't of Health & Hum. Servs.*, No. 21-12243 (11th Cir. July 17, 2021).

[84] *Sec'y, Dep't of Health & Hum. Servs.*, No. 21-12243 (11th Cir. July 23, 2021).

214.   Now, despite the resurgent pandemic, Defendants are "ready to get back to fun!"[85] PRINCESS resumed cruising in late July 2021 and has announced multiple cruises from U.S. ports in the fall of 2021. Other subsidiaries of CARNIVAL have also resumed cruising.

215.   Defendants have proactively marketed to Plaintiffs and Class members, who were passengers onboard the GRAND PRINCESS, urging them to schedule future cruises with the companies. Defendants have offered reduced fares and other incentives to encourage Plaintiffs and the Class to book future travel with CARNIVAL and PRINCESS.

216.   Defendants continue to offer assurances that they are taking proactive measures to combat COVID-19 aboard their ships and prevent future outbreaks. Defendants assert that guests can "cruise with confidence" because they will "make sure it's as safe as possible" by implementing "best practices to protect the health of our guests and crew," including "enhanced screening before embarkation" and "additional sanitation measures on board."[86]

217.   Despite these apparently false assurances of safety, on the inaugural voyage of the Carnival Mardi Gras on July 31, 2021, a brand-new cruise ship operated by CARNIVAL's subsidiary Carnival Cruise Lines, three passengers contracted COVID-19.[87]

218.   On or around October 11, 2021, CARNIVAL announced that a "small number" people aboard the Carnival Vista cruise ship had tested positive for

---

[85] Carnival Corporation, News Release, https://www.carnivalcorp.com/news-releases/news-release-details/mardi-gras-carnival-cruise-lines-newest-and-most-innovative-0 (last visited August 20, 2021).

[86] Princess website, https://www.princess.com/plan/cruise-with-confidence/ (last visited August 20, 2021).

[87] Dave Berman, *As cruise ship passengers and crew contract COVID-19, cruise lines upgrade their protocols*, Florida Today (August 19, 2021), https://www.floridatoday.com/story/money/business/2021/08/19/cruise-lines-upgrade-their-covid-19-protocols-cases-reported-ships/8185670002/ (last visited August 20, 2021).

COVID-19.[88] In fact, at least 27 people onboard the Carnival Vista contracted COVID-19.[89]

219. The Carnival Vista ship's doctor determined that one passenger who had tested positive for COVID-19 needed to be placed on a ventilator, and CARNIVAL arranged for her to be disembarked and sent to a hospital in Belize. She was subsequently flown by air ambulance back to the United States, admitted to intensive care, and again placed on a ventilator. She died of COVID-19 on August 14, 2021.[90]

220. Carnival has declined to provide the public with the number of positive COVID-19 cases on its other voyages, stating "we are not reporting specific numbers."[91]

221. Plaintiffs face a real threat that, absent an injunction, they are likely to be subject to the same acts and omissions by CARNIVAL and PRINCESS, , including misrepresentations about CARNIVAL's and PRINCESS's conduct discharging their duties to Plaintiffs, that will once again expose them to COVID-19 and/or other communicable disease that will cause them injury and emotional harms.

222. Without injunctive relief, Plaintiffs cannot be assured that CARNIVAL and PRINCESS will avoid making misrepresentations and omissions

---

[88] Morgan Hines, *27 people on board Carnival Cruise Line test positive for COVID-19*, USA Today (August 12, 2021), https://www.usatoday.com/story/travel/cruises/2021/08/12/carnival-cruise-ship-covid-27-positive-cases-carnival-vista/8105767002/ (last visited August 18, 2021).
[89] *Id.*
[90] Jim Walker, *Passenger Infected With COVID-19 on Carnival Vista and Abandoned By Carnival in Belize Dies After Returning to the U.S.*, Cruise Law News (Aug. 17, 2021), https://www.cruiselawnews.com/2021/08/articles/disease/passenger-infected-with-covid-19-on-carnival-vista-and-abandoned-by-carnival-in-belize-dies-after-returning-to-u-s/ (last visited August 18, 2021).
[91] *Id.*

1   regarding their conduct discharging their duties to Plaintiffs on future cruise

2   voyages and/or that they will abide by the representations and assurances that they

3   have made to Plaintiffs, and are likely to once again suffer harms like those alleged

4   in this Complaint.

5                                          **NOTICE**

6          223.   Section 16(A)(i) of the Passage Contract purports to require that

7   claimants provide notice to PRINCESS and CARNIVAL of any potential claims.

8   Although Plaintiffs do not concede that this provision is enforceable, Plaintiffs and

9   Class Members have complied with this requirement by providing written notice to

10  Defendants' electronically on June 25, 2020 and July 7, 2020.

11                          **CLASS ACTION ALLEGATIONS**

12         224.   Plaintiffs bring this lawsuit as a class action on behalf of themselves

13  and all similarly-situated persons pursuant to Federal Rules of Civil Procedure

14  23(a) and (b)(1), (b)(2), (b)(3), and/or (c)(4). This action satisfies the applicable

15  numerosity, commonality, typicality, adequacy, predominance, and/or superiority

16  requirements of those provisions.

17         225.   The proposed Class is defined as follows:  All persons in the United

18  States, who sailed as passengers on the M/V GRAND PRINCESS cruise from San

19  Francisco, California, leaving on February 11, 2020, roundtrip to Mexico, including

20  those passengers who continued traveling onboard the M/V GRAND PRINCESS to

21  Hawaii, which embarked on February 21, 2020.

22         226.   Excluded from the proposed Class are: (1) CARNIVAL and

23  PRINCESS, any entity or division in which either have a controlling interest, and

24  its legal representatives, officers, directors, assigns and successors; (2) the judicial

25  officer(s) to whom this case is assigned and the judicial officer(s)' immediate

26  family and legal staff; and (3) governmental entities. Plaintiffs reserve the right to

27  amend the Class definition if discovery and further investigation reveal that the

28

Class should be expanded, otherwise divided into subclasses, or modified in any other way.

227.   The individual Plaintiffs named in this complaint support the use of the class action mechanism to achieve economy, efficiency, fairness, and consistency of result by determining the important common questions raised in this action on a common basis.

### A.   **Numerosity**

228.   There were, on information and belief, approximately 2,422 passengers on the GRAND PRINCESS for the cruise that is the subject of this action. Their exact number and identities can be readily ascertained from Defendants' records. The individual joinder of all passengers is impractical, and the class action procedure is more practical, cost-effective, inclusive, and efficient than multiple lawsuits on the common questions of law and fact that unite the class, or piecemeal and incomplete individual joinder. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Department of Health and Human Services.

### B.   **Typicality**

229.   The claims of Plaintiffs are typical of the claims of Class Members in that Plaintiffs, like all Class Members, sailed on the leg of the GRAND PRINCESS cruise that began on February 11, 2020 and returned on February 21, 2020. Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that they sailed on a cruise they would not have sailed on and suffered significant injury, emotional distress and economic damage, including medical monitoring, caused by the negligence of the Defendants. The factual bases of CARNIVAL and

PRINCESS's misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

C.   **Adequate Representation**

230.   Plaintiffs CYNTHIA LYNN FORD, JAMES DAVID ARTHUR FORD, CAROLE KEALY, KELLY SANDOVAL, and RUBEN SANDOVAL will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs CYNTHIA LYNN FORD, JAMES DAVID ARTHUR FORD, CAROLE KEALY, KELLY SANDOVAL, and RUBEN SANDOVAL have retained counsel with substantial experience in prosecuting class actions, aggregate suits, and mass torts.

231.   Plaintiffs CYNTHIA LYNN FORD, JAMES DAVID ARTHUR FORD, CAROLE KEALY, KELLY SANDOVAL, and RUBEN SANDOVAL and their counsel are committed to vigorously prosecuting this action on behalf of all Class Members, and have the financial resources to do so. Neither Plaintiffs CYNTHIA LYNN FORD, JAMES DAVID ARTHUR FORD, CAROLE KEALY, KELLY SANDOVAL, nor RUBEN SANDOVAL, nor their counsel have interests adverse to those of the Class Members.

D.   **Predominance of Common Issues**

232.   There are numerous questions of law and fact, including those related to Defendants' knowledge, conduct, and duty throughout the events described in this Complaint, common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include, *inter alia*:

a.   what Defendants knew about the presence and risks associated with the COVID-19 virus, and contagions generally, and when they knew it;

b.      whether Defendants should have canceled the subject cruise to avoid exposing passengers to a deadly pathogen and/or taken other steps to avoid exposing passengers to a deadly pathogen, such as imposing social distancing requirements, eliminating mass gathering, and quarantining;

c.      whether, in light of the widespread knowledge of COVID-19 and Defendants' knowledge of the risk of contagion aboard cruise ships, Defendants had a duty to conduct medical screenings of passengers prior to boarding Plaintiffs and others onto the M/V GRAND PRINCESS on February 11, 2020;

d.      whether Defendants had a duty to decontaminate the M/V GRAND PRINCESS after they knew or should have known that individuals aboard the M/V GRAND PRINCESS prior to the subject cruise were or were potentially carriers of the COVID-19 virus;

e.      whether Defendants had a duty to disclose to passengers onboard the M/V GRAND PRINCESS that at least one person onboard the vessel was experiencing symptoms of COVID-19, and the related risks that Plaintiffs could contract and /or spread the virus;

f.      whether Defendants had a duty to institute social distancing or quarantine protocols on the ship when they became aware that at least one passenger onboard was suffering from COVID-19 symptoms;

g.      whether Defendants failed to disclose, during the vessel's trip or in the days immediately following, that passengers and crew aboard the M/V GRAND PRINCESS between February 11, 2020, and February 21, 2020, were or were potentially carriers of the COVID-19 virus and other relevant information;

h.      interpretation of the applicable contract documents and the associated "Passenger Bill of Rights" incorporated therein;

i.  whether Defendants acted as alter egos and/or agents, such that they should be held jointly liable for the conduct alleged herein;

j.  whether CARNIVAL is liable for the acts, omissions, and violations described in this Complaint;

k.  whether PRINCESS is liable for the acts, omissions, and violations described in this Complaint; and

l.  whether the conduct of any or all of the defendants warrants the imposition of punitive damages to vindicate the societal interest in punishment and deterrence.

**E.**    **Superiority**

233.  Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of CARNIVAL's and PRINCESS's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

234.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims (compared to the cost of litigation), it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.

235.  Class treatment of common questions of law and fact is superior to other available procedures, such as multiple individual actions or piecemeal litigation because class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

1

### F.     Limited Fund

2       236.   In an abundance of caution, Plaintiffs take note of the presently

3   apparent financial circumstances of CARNIVAL and/or PRINCESS, including

4   their reported operating loss of $10.2 billion in 2020, to allege the possibility that

5   their assets and resources available to fairly compensate Plaintiffs and Class

6   Members, to satisfy appropriate punitive damages awards, and/or otherwise fairly

7   address the claims against them may constitute a "limited fund" within the meaning

8   of *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), such that class certification

9   under Rule 23(b)(1)(B) is necessary and appropriate as a matter of due process and

10  equity.

11      ### G.     Mass Action

12      237.   In the alternative, this matter should proceed as a mass action, as

13  defined in 28 U.S.C. § 1332 (d)(11)(B)(i) and should be tried jointly on the ground

14  that Plaintiffs' claims involve common questions of law or fact, including as set

15  forth above.

16      238.   Plaintiffs' individual claims exceed the required jurisdictional amount

17  of $75,000.00.

18                          **CLAIMS FOR RELIEF**

19                        **FIRST CAUSE OF ACTION**
20                **NEGLIGENCE AGAINST ALL DEFENDANTS**

21      239.   Plaintiffs re-allege all allegations in paragraphs 1 through 222 as if

    alleged fully herein.

22      240.   Defendants PRINCESS and its owner CARNIVAL, which supervises

23  and monitors PRINCESS's adherence to safety, security, environmental, and

24  regulatory requirements, owed Plaintiffs, and the Class, who were passengers who

25  boarded the M/V GRAND PRINCESS on February 11, 2020, and who Defendants

26  therefore had a custodial relationship over, a duty to ensure that they would not be

27  exposed to an unreasonable risk of harm.  Defendant CARNIVAL, who wholly

28

owner PRINCESS and "currently monitors and supervises" PRINCESS's adherence to "environmental, safety, security, and regulatory" requirements owed Plaintiffs a duty to ensure that their passage would be safe and secure, and free from exposure to an unreasonable risk of harm.

241.   CARNIVAL and PRINCESS held themselves out as committed to and responsible for ensuring the health and safety of their vessels and the passengers onboard those vessels—including the M/V GRAND PRINCESS. Plaintiffs and Class members took Defendants at their word and put themselves in Defendants hands for the full duration of the voyage that is the subject of this Complaint. Plaintiffs and Class members relied on Defendants to ensure their security. Thus, Defendants owed Plaintiffs and the Class a duty to take actions to prevent and mitigate the risk of threats to passengers' health and safety, including by ensuring that the M/V GRAND PRINCESS was properly cleaned, disinfected, and safely maintained. Furthermore, Defendants owed Plaintiffs and Class members a duty to not take actions that would exacerbate the spread and threat of COVID-19 onboard the ship.

242.   Defendants knew or should have known the unique conditions aboard cruise ships that create a particular risk of viral outbreak.  Defendants knew or should have known that cruise ships owned and operated by Defendants had been the sites of prior, lethal outbreaks of COVID-19, and should have been aware of new guidelines for the cruise industry published by Dr. Hadjichristoulou and a team of European experts on February 3, 2020. In particular, Defendants had knowledge of the actual risks facing passengers based on the outbreak of the virus on the M/V Diamond Princess.

243.   Defendants knew or should have known that passengers boarding the M/V GRAND PRINCESS could be carriers of COVID-19, and that crew members aboard the M/V GRAND PRINCESS were or could have been exposed to COVID-

19 and were or could have been carriers of the virus, but did not institute any screening procedures prior to the February 11, 2020, embarkation of the M/V Grand Princess.

244.   Defendants failed to do what a reasonably careful cruise ship owner and operator would do under the circumstances.

245.   Defendants breached their duties to Plaintiffs and the Class when, with the aforementioned knowledge, Defendants nevertheless chose to embark on the San Francisco-Mexico voyage.

246.   Defendants also breached their duties when, with that same knowledge, they chose not to screen or medically examine any passengers or crew members, or prevent those infected with the virus from boarding the ship, prior to embarkation on February 11, 2020, or throughout the cruise at any ports of call after passengers had left and returned to the ship.

247.   Additionally, Defendants breached their duties to Plaintiffs and the Class when Defendants repeatedly failed to notify passengers aboard the M/V GRAND PRINCESS during the instant voyage that passengers traveling alongside them were suffering from COVID-19 symptoms.

248.   If Defendants had adequately informed Plaintiffs and the Class prior to boarding, or at any other time, of the relevant information in Defendants' possession, including facts regarding Defendants' lack of adequate disinfecting procedures on the M/V GRAND PRINCESS, lack of adequate quarantining procedures, and the actual risk of exposure to COVID-19, Plaintiffs and the Class could have made informed decisions about their health and their families' health, including disembarking from or not boarding the vessel.

249.   Defendants repeatedly breached their duties to Plaintiffs and the Class when, throughout the San Francisco-Mexico voyage, with the aforementioned knowledge, they repeatedly chose not to inform Plaintiffs of the continuing and

growing risks of contracting COVID-19, and chose not to provide Plaintiffs with the informed option to disembark at one of the vessel's ports of call.

250.   Finally, Defendants continued to breach their duties to Plaintiffs and the Class when, after learning that at least one passenger onboard was suffering from COVID-19 symptoms, they, *inter alia*:  chose not to warn Plaintiffs' and the Class of the potential for infection; failed to implement quarantine or social distancing protocols; chose to continue operating large, public gatherings and meals; chose to continue to operate daily turndown service; and chose to continue hosting communal activities.

251.   As a direct and proximate result of Defendants' breach of their duties of care and their negligent exposure of Plaintiffs and the Class to COVID-19, Plaintiffs and the Class have suffered illness and injury as described above in paragraphs 148 through 198.

252.   As a direct and proximate result of PRINCESS's and CARNIVAL'S failure to safeguard Plaintiffs and the class, and as a direct and proximate result of PRINCESS's and CARNIVAL's other acts and omissions as laid out herein, Plaintiffs were directly exposed COVID-19 and to actual risk of immediate physical injury, Plaintiffs and the Class have suffered physical injury, emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame. They were traumatized by the reasonable apprehension of developing COVID-19. It is expected that they will continue to suffer and will, in the future, require medical services not of a kind generally anticipated as part of the effects of daily life.

**SECOND CAUSE OF ACTION**
**GROSS NEGLIGENCE AGAINST ALL DEFENDANTS**

253.   Plaintiffs re-allege all allegations in paragraphs 1 through 222 as if alleged fully herein.

254.   Defendants PRINCESS and its owner CARNIVAL, which supervises and monitor's PRINCESS's adherence to safety, security, environmental, and regulatory requirements, each owed duties to Plaintiffs and the Class to:  safeguard against and mitigate the risks of passenger injury and illness; appropriately disinfect and sanitize the M/V GRAND PRINCESS, in light of the circumstances of a global pandemic; notify Plaintiffs and the Class of the actual and especially high risk of contracting COVID-19 aboard the M/V GRAND PRINCESS; disembark passengers and crew members who had likely come into contact with individuals infected with COVID-19; and implement medical screening and examination protocols for crew and passengers.

255.   Defendants knew of the unreasonably high risk of viral contagion of COVID-19 on cruise ships, and Defendants knew that it was especially dangerous to expose Plaintiffs and the rest of the Class to COVID-19 in light of the prior situation on the Diamond Princess off the coast of Japan.

256.   Defendants' conduct in deciding to continue to operate the M/V GRAND PRINCESS with Plaintiffs and the Class aboard, even with the aforementioned knowledge, demonstrates an intentional failure to do what a reasonably careful cruise ship owner and operator would do under the circumstances, exhibits a willful and conscious disregard for the safety of Plaintiffs and the Class, and evidences recklessness and indifference by Defendants, which constitutes gross negligence.

257.   Defendants' failure to abide by the guidelines issued on February 3, 2020, by not disembarking, quarantining or otherwise sheltering in their cabins the passengers and crew members known to have come into contact with the passenger(s) suffering from COVID-19 symptoms onboard the instant cruise demonstrates a willful and conscious disregard for the rights and safety of others

and amounts to an extreme departure of what a reasonably careful cruise ship owner and operator would do.

258.   Defendants' choice not to warn Plaintiffs and the Class of their actual risk of harm in being exposed to COVID-19 after learning about a passenger onboard who came down with symptoms (and later died) constitutes a failure to provide even a modicum of care to Plaintiffs and the Class. The continued and repeated choice not to provide passengers with notice of the actual risks facing them demonstrates a willful and conscious disregard for the rights and safety of others and amounts to an extreme departure of what a reasonably careful cruise ship owner and/or operator would do.

259.   Moreover, Defendants' behavior demonstrated a willful and conscious disregard for the rights and safety of others, and an extreme departure of what a reasonably careful cruise ship owner and/or operator would do in their continued and repeated choices to:  not effectively sanitize and disinfect the M/V GRAND PRINCESS during the San Francisco-Mexico voyage; not institute medical screening and examinations for passengers and crew members; host large social gatherings and meals; conduct daily turn-down service; and not implement quarantine or social distance protocols at any point during the voyage. These decisions manifest Defendants' utter failure to provide even a modicum of care to Plaintiffs and the Class.

260.   Defendants chose to place profits over people, including the safety of their passengers, crew, and the general public in continuing to operate business as usual, despite their knowledge of the actual—potentially lethal—risk to Plaintiffs and the Class.

261.   Indeed, as a direct and proximate result of Defendants' extreme departure from the ordinary standard of care and their failure to meet their duties of

care to Plaintiffs and the Class by providing even scant care, Plaintiff s experienced COVID-19-associated symptoms as described in paragraphs 148 through 198.

262.   Finally, as a direct and proximate result of Defendants' gross negligence in exposing Plaintiffs and the Class to actual risk of immediate physical injury, Plaintiffs and the Class have suffered emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame. They were traumatized by the fear of developing COVID-19. It is expected that they will continue to suffer and will, in the future, require medical services not of a kind generally accepted as a typical part of daily life.

## THIRD CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

263.   Plaintiffs re-allege all allegations in paragraphs 1 through 222 as if alleged fully herein.

264.   Defendants CARNIVAL and PRINCESS knew or should have known of the actual, unique risk of viral contagion of COVID-19 aboard cruise ships, and, in light of the situation on the Diamond Princess only 3 weeks prior to the instant voyage on the M/V GRAND PRINCESS, Defendants knew or should have known that it was especially dangerous to expose Plaintiffs and the rest of the Class to COVID-19.

265.   Even in light of this information, however, Defendants failed to implement any effective screening or medical examination procedures for passengers boarding the ship prior to the voyage.

266.   Defendants also knew or should have known that at least one passenger traveling on the instant trip aboard the GRAND PRINCESS was experiencing symptoms of COVID-19 (that passenger eventually tested positive for COVID-19).

267.  Nevertheless, Defendants continually and repeatedly acted or failed to act in ways that caused Plaintiffs to be exposed to COVID-19, including but not limited to:  failing to take any effective actions to prevent or mitigate the spread of COVID-19; failing to alert passengers to the possibility of infection aboard the ship; hosting and encouraged participation in large group activities and events that Defendants knew could lead to large-scale infection among the crew and passengers.

268.  These choices by Defendants created a dangerous and threatening environment in which Plaintiffs and the Class were forced to live for almost two weeks, at all times directly exposed to COVID-19 and at risk of becoming infected with, made ill by, and/or spreading COVID-19. And Defendants' acts and omissions likely exacerbated the spread of the virus aboard the ship.

269.  As the direct and proximate result of Defendants' actions and omissions throughout the duration of their voyage aboard the GRAND PRINCESS, Plaintiffs and members of the Class were in the "zone of danger," where they were directly exposed to a potentially-lethal virus, and placed at immediate risk of—and actually suffered—actual physical harm as a result of their direct and prolonged exposure to COVID-19.

270.  As a result of this exposure, which was directly and proximately caused by Defendants' acts and omissions, Plaintiffs and members of the Class experienced severe psychic injuries, of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, when they were forced to watch first hand as their friends and family members became ill with COVID-19, were concerned for their own safety and well-being, and continue to expect that they may begin exhibiting symptoms or health complications not yet identified as a result of COVID-19. Plaintiffs suffered physical and emotional injury as the direct and proximate result of Defendants' misconduct.

271.   As a direct and proximate result of Defendants' extreme departure from the ordinary standard of care and their failure to meet their duties of care to Plaintiffs and the Class by providing even scant care, which exposed Plaintiffs and the Class to COVID-19, Plaintiffs and the Class have suffered illness and injury as described above in paragraphs 148 through 198.

272.   Finally, as a direct and proximate result of Defendants' gross negligence, Plaintiffs and the Class were exposed to COVID-19 and threatened with serious physical injury. As a result, Plaintiffs and the Class have suffered emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame related to their own risk of contracting COVID-19 and the suffering they witnessed among their fellow passengers who contracted COVID-19. Plaintiffs and members of the class were traumatized by the reasonable apprehension of their family members, friends and fellow passengers developing COVID-19 and by the threat to their own health of becoming infected with the virus or suffering future negative health outcomes or complications related to exposure to and / or contraction of the virus.

273.   Plaintiffs and Class members were endangered and harmed by Defendants' actions when they were forced to travel on an infested vessel without appropriate information about the risks facing them. It is expected that Plaintiffs and the Class will continue to suffer and will, in the future, require medical services not of a kind generally anticipated as a typical part of daily life.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves, and all others similarly situated, pray for judgment against Defendants, and each of them, as follows:

1.      An order certifying the proposed Class pursuant to Fed. R. Civ. P. Rule

23(a) and (b)(1), (b)(2), (b)(3) and/or (c)(4), designating Plaintiffs Cynthia Lynn Ford, James David Arthur Ford, Carole Kealy, Kelly Sandoval, and Ruben Sandoval as named representatives of the Class and designating the undersigned as Class Counsel;

2.      An award of damages totaling in excess of Five Million Dollars ($5,000,000.00), inclusive of compensatory damages for Plaintiffs' injuries, including emotional pain and suffering and any other damages allowed by law, in an amount to be proven at trial;

3.      An award of the costs associated with the ongoing medical monitoring and diagnostic examinations required to diagnose, prevent, and/or treat current or future injury related to Plaintiffs' and Class Members' exposure to, illness and disease caused by, and contraction, asymptomatic contraction, and/or potential contraction of COVID-19, in light of the evolving scientific understanding of the full risk and scope of health outcomes related to and / or resulting from the virus;;

4.      An injunction requiring Defendants to: disclose to future passengers the nature and rate of risk of communicable disease upon their cruise ships; implement disinfecting and sanitizing procedures on each of their ships in between and during voyages; implement appropriate social distancing and physical distancing protocols to avoid or reduce the transmission of communicable pathogens; disembark and quarantine passengers when Defendants become aware of a heightened risk of communicable disease aboard a ship; and canceling or discontinuing the operation of cruises when Defendants know or should have known of a potential deadly pathogen or similar aboard their ships.

5.      An award of attorneys' fees and costs, as allowed by law;

6.      An award of pre-judgment and post-judgment interest, as provided by law;

7.     Leave to amend this Complaint to conform to the evidence produced at trial; and

8.     For such other and further relief as the Court deems just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Respectfully submitted,

Dated:     August 23, 2021       NELSON & FRAENKEL LLP


By:  */s/ Gretchen M. Nelson*

Gretchen M. Nelson (112566)
gnelson@nflawfirm.com
Carlos F. Llinás Negret (284746)
cllinas@nflawfirm.com
601 So. Figueroa Street, Suite 2050
Los Angeles, CA 90017
Telephone:  213-622-6469
Facsimile:  213-622-6019

Dated:     August 23, 2021       MARY ALEXANDER & ASSOCIATES, P.C.


By:  */s/ Mary E. Alexander*

Mary E. Alexander, Esq. (SBN 104173)
*malexander@maryalexanderlaw.com*
Brendan D.S. Way, Esq. (SBN 261705)
*bway@maryalexanderlaw.com*
44 Montgomery Street, Suite 1303
San Francisco, California 94104
Telephone: (415) 433-4440
Facsimile: (415) 433-5440

SECOND AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES

1
2

Dated:     August 23, 2021          LIEFF CABRASER HEIMANN &
                                    BERNSTEIN, LLP

3

4

By:   */s/ Christopher E. Coleman*

5

6

Elizabeth J. Cabraser (SBN 083151)
*ecabraser@lchb.com*
Jonathan D. Selbin (SBN 170222)
*jselbin@lchb.com*
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

7

8

9

10

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
Mark P. Chalos (*Pro Hac Vice*)
*mchalos@lchb.com*
Christopher E. Coleman (*Pro Hac Vice*)
*ccoleman@lchb.com*
222 2nd Avenue South, Suite 1640
Nashville, TN 37201
Telephone: (615) 313-9000
Facsimile: (212) 313-9965

11

12

13

14

15

*Attorneys for Plaintiffs*

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **CERTIFICATE OF SERVICE**

I, Christopher E. Coleman, hereby certify that on August 23, 2021, I caused to be electronically filed the above **SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES** with the Clerk of the United States District Court for the Central District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.


*/s/ Christopher E. Coleman*
Christopher E. Coleman

SECOND AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES